Reed, J.,
delivered the opinion of the court.
There are in this case sixty-one errors assigned, many of which are purely technical, and are not discussed in argument. Some few are presented and discussed at considerable length. Without considering the mass of errors assigned, or the most of them, sufficient remains to raise the important and fundamental questions that must determine the case.Before proceeding to those, I will briefly dispose of the first. -
The application for insurance and the policy of insurance remained separate and distinct papers. At the time of the: trial they had not been attached,' the application remaining in the hands of the company, while the policy was in the possession of insured. The plaintiff (appellee) put the policy in evidence without the application, and without calling upon the defendant to produce it. This is urged as error. The- *106 application upon which the defendant alleged the policy was issued was set out in the answer in Time verba; was by the defendant put in evidence upon the trial.
In Lycoming Mu. Ins. Co. v. Sailer, 67 Pa. St. 108, the same error was assigned. The court held: “ But this error, if it was one, did the defendants no harm. They afterwards produced and gave in evidence the application, and they have had on trial all the advantage of that document.” Such was the case here. Although, perhaps, a technical error, the defendant could not have been prejudiced by it. Hence the contention is without valid force. The application in question was the basis of the defense. All the important questions presented grow out of it.
Before proceeding to the consideration of the other questions involved, it may be well to refer to Wich v. Fquitable Ins. Co., 2 Colo. App. 484, in which counsel for appellee say: “ This court has already considered and adjudicated the main features of the present controversy, so far, at least, as concerns the right of the plaintiff to go to the jury upon the fact presented in his case in chief.” The cases are in some respects identical, — the same plaintiff, the same property, and the same loss, — but there are one or two important questions involved in the present case that were absent in that. By reference to that case it will be seen that at the close of the plaintiff’s evidence a motion for nonsuit was .made and sustained.
It was held erroneous; that the issues made by the pleadings were, many of them, of fact, which were clearly within the province of the jury, and that the parties were legally entitled to have the questions determined by the jury.
In this case no such question is presented. It was tried to a jury, and no important question raised in this was determined in that; consequently, no adjudication of any question involved. The questions presented for determination are : First. Carleton being a soliciting agent of Perkins, Hart & Co., and appellant making the insurance at the solicitation and at the instance of Perkins, Hart & Co., to what extent *107 did appellant adopt his agency, and to what extent is appellant bound by his acts ? Second. Were the statements made by Carleton and Shreeve, and by them reduced to writing in the application upon which the policy was issued, and executed by appellee, warranties upon the part of appellee, which would vitiate the contract of insurance if the statements were untrue ? These two questions, the second involving two or more propositions, seem conclusive of the case.
' There is probably no branch of jurisprudence so confused by judicial decision in courts of greatest merit as the questions presented. At the very outset, the investigator plunges into an impenetrable fog. Many courts, regarding the provisions of policies of insurance as onerous and preventing the insured from securing the benefits of his contract, have as far as possible departed from the rules of construction adopted in other contracts, and waived in favor of the insured contract obligations which would have been enforced in other transactions; while other courts, of equal reputation, have attempted to construe the contract of insurance the same as other contracts, and held the insured responsible for his own acts, unless the contract was, in its inception, so affected by fraud as would avoid other contracts.
Appellant, having taken the risk at the instance and request of Perkins, Hart & Co., and upon data furnished by them, obtained through their agent Carleton, may be regarded, to that extent, as having adopted the acts of such agent, and as being bound by them to the same extent that Perkins, Hart & Co. would be. But this is no solution of the question presented, for the question then presented is, how far Perkins, Hart & Co. were bound by his acts and representations.
It is conceded that Carleton was a special or soliciting agent to obtain contracts of insurance, without power to issue policies or conclude contracts, who could only report his doings and findings to his superiors, who at their own election accepted or rejected the proposal.
That class of agents, clothed by their superiors with some *108 indicia of authority to act for the company, are anomalous in business transactions, — sent out as solicitors to secure business, receiving their compensation by commission upon the business secured. It is apparent that they are by their principals placed in a position to perpetrate a double fraud : First, upon their employer by excessive insurance; second, upon the insured by garbled or manufactured statements of the value and condition of the property, for the purpose of securing the commissions, the obtaining of which depends upon the completion of the contract, and the amount of such compensation upon the amount of insurance. The insured is required to make and sign an application which of necessity preceded the issuing of the policy. After viewing the premises, the application is filled by the solicitor. To secure compensation, the values and conditions are overestimated and erroneously stated. The insured, having no knowledge of its legal effect upon the insurance to be effected, executes it; is perhaps told that “it is only a matter of form,” necessary to secure the insurance, in other respects unimportant. The company, by its policy, protects itself against the fraud, but the insured has no protection.
It has been held by many respectable courts, and frequently urged in argument, that the agent, in the appraisal of the property and filling up of the application, was not the agent of the insurer, but the agent of the insured, who was responsible for his misrepresentations, when in fact, if the agent of either, it must of necessity have been that of his employer, who had given him the power to act in its behalf, and whose interests should have been guarded by the agent. The truth is that a person occupying such a hybrid, amphibious position is not the agent of either, but working for himself, regardless of the interests of both. Against his fraudulent acts the company, which has placed it in his power to defraud others, is amply protected, while the insured, who gives him credit as an agent, has no protection whatever. The whole system - of representation by solicitors is vicious, and should be abrogated by legislation or otherwise, and the principals made *109 responsible for tbe acts of the agents within the seeming and apparent limits of their authority.
The law, under the circumstances of this case, makes it obligatory upon the party dealing with an agent to ascertain the extent of the authority conferred. If he fails to do so, it is at his own peril.
On February 4, 1889, the insurance was effected. The following paragraph appears in the body of tbe policy: “ If an application, survey, plan, statement, or description of the property hereby insured is referred to in this polic3r, such application, survey, plan, statement, or description shall be considered a part of this contract, and to be a warranty by the insured, whether the same be written by the insured or by some other person; and this policy shall become void in the event of any false representation by the insured of the condition, situation or occupancy of the property, or of an3r omission to make known any facts material to the risk, or of any other valuation or any misrepresentation whatsoever, either in a written statement or otherwise. And the society shall not be bound under this policy by any act of or statement made to or by any agent or other person, which is not authorized by this policy, or contained therein or in any written paper above mentioned.”
It appears the firm of Perkins, Hart & Co. had previously insured the same property, through the solicitor Carleton, for about $11,000. Soon after the purchase by appellee and his associates, Carleton again applied to insure it. The evidence shows he personally made an examination, and estimated the value of the property; informed Wich he could put $15,000 on it; filled the application himself, and Wich executed it. Perkins, Hart & Co. could only take of the $15,000 $13,470, and obtained the balance, $1,530, through the office of Packard, Wilson & Piper, which is the matter in controversy. The application to Perkins, Hart & Co., as made by Carleton, was presented to agents of appellant by the other firm, but being unsatisfactory in some respects, a new one was required. Here occurs a peculiar conflict in *110 evidence in regard to the person who wrote and secured the second application, delivered the policy, and collected the premium. Wich testified that it was Carleton, and that he had never seen Shreeve until he saw him in court during the trial. Shreeve testified that he was a member of the firm of Packard & Co.; that he called upon Wich with the Carleton application, and required another; and that he filled up the application, executed by Wich, upon which the policy in this case was issued. It appears to have been a case of mistaken identity, and that the Carleton application was the basis of the second application, which was only changed in some particulars and secured by Shreeve.
It is contended upon the part of appellee that the application, being detached and not specially referred to in the policy, is not a part of the contract. It is true that in the reference to the application its date is omitted, but it is not shown that the application need be dated. It was in this instance, but the date was not inserted in the reference attached to the policy. Such omission is unimportant when the instrument is put in evidence and identified by both parties, nor is it necessary that the paper be attached. Contracts are frequently evidenced by two, three, or more individual papers, the relevancy and connection being established by parol proof, in the absence of which the attaching of the papers would not establish their identity.
A principal contention by counsel of appellee is that by reason of the acts and participation of the agent and Shreeve in getting up the application it is not the act of nor obligatory upon the appellee; in fact, that there was no such contract as is evidenced by the papers. Many authorities are cited that are supposed to sustain that position, the first being State Ins. Co. v. Taylor, 14 Colo. 499. A slight examination of that case will show that there was no application signed by the insured. It was made, signed and delivered by the agent, and the insured had no knowledge of or connection with it; hence there was no contract, and nothing con *111 tained in the pretended application was obligatory upon the insured.
Very many courts of great respectability have as far as possible relieved applicants from the full effect of statements made in the application. The “ iron clad ” provisions of policies issued, together with the manner of securing insurance through irresponsible agents, for whose acts the employer ignores all responsibility, have compelled courts to carry the law to the extremest possible limit to guard the rights of the insured and afford him indemnity. Consequently, many authorities may be found seemingly sustaining the contention of counsel: but a careful examination-of them shows not.one going to the extent-of shielding the applicant in this ease from responsibility under the circum--stances as shown.
There is no claim that appellee was uneducated and illiterate, — the reverse appears from his own evidence, — nor was there any attempt to show fraud or imposition in obtaining the paper. True, the paper was filled by the other party. It was unimportant who did the clerical work. It was executed and adopted by appellee. If he failed, as he testifies, to read it, his failure to do so cannot be imputed to the other-party. Immediately above the signature of appellee, at the bottom of the application, printed in clear type, appears the following: “ The applicant hereby covenants and agrees to and with the said company, that the foregoing is a just, full and true exposure of all the facts and circumstances in regard to the property heretofore mentioned, and said answers and representations are considered the basis on which insurance is to be effected, and the same is understood as incorporated in and forming a part of the policy, and further covenants and agrees that if the situation or circumstances are changed, or risk increased, or property become incumbered in any 'manner or way, during the term of any policy or policies of insurance of this company insuring the said property, will notify the agent of this company forthwith of such alteration, increase of risk or incumbrance, and hereby .declare and *112 acknowledge that this is the act and statement of the owner of said property, and warranty on part of assured .whether the answers have been written by the applicant in person or not.”
It was impossible that appellee could have executed the paper without seeing it. If he failed to read it, he should suffer the consequences of his own negligence. No man can shield himself from the obligation of a contract he has executed by a willful or negligent refusal to read the paper he signs.
The theory upon which courts proceed in allowing the acts of the agent to be put in evidence to avoid the seeming contract is, in effect, that the supposed warranties of the insured in the application were put in by fraud on the part of the agent; that the insured did not participate; hence there was no contract; and in all cases when the circumstances will warrant, holding the principal responsible for the acts of the agent, by estoppel. This seems a plausible evasion of the rule that verbal testimony is not admissible to vary a written .contract.
The courts most strongly sustaining the contention of •appellee are those of Iowa, Indiana and Minnesota. In the former state, where the decisions are extreme, they are founded upon a statute of that state holding the company to greater responsibility of the acts of the soliciting agent. None others go to the extent supposed by counsel. Among those cited and relied upon there are some which, under the circumstances of this case, maintain the opposite doctrine; notably, Life Ins. Co. v. Rogers, 119 Ill. 474; Rogers v. Ins. Co., 121 Ind. 570; Pickel v. Ins. Co., 119 Ind. 291.
Until there is legislation curing the vicious course of insurance through the employment of solicitors, whose acts are repudiated by their employers, it is far safer, while protecting the insured as far as possible against the frauds of the agent, to hold cases of the character of the one under consideration as contracts where, as in other contracts, each party is responsible for his own acts and undertakings. In *113 1 May on Insurance, sec. 138, et seq., the questions here presented are elaborately discussed, but the statements of different conclusions from different courts are so confusing and conflicting as to be of slight aid to the examiner, until section 144<7 is reached, where the following clear and logical conclusion is stated: “ There being no usage or special evidence to the contrary, the very fact that his signature to the paper is required is notice to him that the company does not rely upon the agent, but requires the applicant's own authority." Under the circumstances and the employment of solicitors, it is safe and proper to hold that the agent, in writing the answers of the applicant, is not doing the work of the company but of the applicant, and that the company are no more responsible for it than if done by a stranger. A solicitor working for commissions comes nearer being a broker than an agent. Their interests are often adverse to the company, making false statements to secure commissions ; nor can the assured avoid responsibility by neglecting to read the paper, when by so doing the misstatements could have been corrected. In the same section of May on Insurance (sec. 144^) it is said: “It seems clear that if (the insurer) is honest and fair, it should not be held for an omission or error of a really substantial nature, whether made by the insured, or by the agent, through mistake or otherwise, in filling up an application from his answers, and which the assured might have discovered if he had taken the trouble to read the statement he signed."
There is no reason, in contracts of insurance^ that a party should be, by law, relieved from the duty of exercising the same ordinary care and prudence that is required in every other business transaction. It is the duty of every man to read what he signs. His failure to do so will or should not relieve him, or allow him to avoid the contract.
In New York L. Ins. Co. v. Fletcher, 117 U. S. 519, the agent set down false answers, and the applicant signed the application without reading it. The policy issued upon it was conditioned that the answers were part of it, and that; *114 no statement to the agent not thus transmitted should be binding on the principal. These conditions, conspicuously printed upon it, accompanied the policy. The policy was held void. The court said: “ It was the duty of the applicant to read the application he signed. He knew that upon it the policy would he issued if at all. It would introduce great confusion in all business transactions, if a party making written proposals for a contract, with representations to induce its execution, could be allowed to show, after it had. been obtained, that he did not know the contents of his proposals, and to enforce it, notwithstanding their falsity as to matters essential to its obligation and validity. Contracts could not be made, or business fairly conducted, if such a rule should prevail.” See Lewis v. Ins. Co., 39 Conn. 100; Ryan v. Ins. Co., 41 Conn. 168; Richardson v. Ins. Co., 46 Me. 394.
In 1 Wood on Insurance, sec. 150, it is said: “ When the policy refers to the application or other papers connected with the risk, and adopts them as part £>f the contract of insurance, all the statements of the assured contained therein relative to the situation, use, care, or character of the property are warranties on his part, and must be strictly complied with, whether material to the risk or not.”
In Marshall v. Ins. Co., 27 N. H. 157, it is said: “ The application in such cases must truly represent the risk, and must be true in all respects, whether material or not.”'
In New York the same conclusions as above are stated as the law. See First Nat. Bank v. Ins. Co., 50 N. Y. 47; Leroy v. Ins. Co., 39 N. Y. 91, also 45 N. Y. 80; Ripley v. Ins. Co., 39 N. Y. 136. See, also, Garcelon v. Hampden Co., 50 Me. 580; Battles v. York Ins. Co., 41 Me. 208; Kelsey v. Ins. Co., 35 Conn. 225; Gahagan v. Ins. Co., 43 N. H. 176; Tebbetts v. Ins. Co., 1 Allen (Mass.), 305; Draper v. Ins. Co., 2 Allen, 569; Brown v. Ins. Co., 11 Cush. (Mass.) 280; Bersche v. Ins. Co., 31 Mo. 555; Edwards v. Ins. Co., 74 Ill. 84.
That such has been the line of decision in England, see Newcastle etc. Co. v. Macmorran, 3 Dow, 255; Bufe v. Tasner, 2 Marsh. 46; Britton v. Royal Ins. Co., 4 Foster & F. *115 905; Macdonald v. Fire etc. Ins. Co., 8 Q. B. 328; Thompson v. Weems, 9 App. Cas. 671.
The testimony clearly establishes the fact that the title to the property was misstated to the insurers, the deed having been made by the grantor, McCandless, to appellee, Herman Ell, Gottlieb Hess, and Paul Voght. There was no such corporation or association as The Arkansas Brewing Company to take title. 2d. That in the application appellee stated the value of the insured property to be $25,000, and such application contains the following clause : “ The value of the property being fixed and warranted by applicant; ”— when in fact the greatest valuation warrantable, including betterments made by the owners, was less than $14,000, some $1,500 of which was not covered by insurance, showing overvaluation of 100 per cent, and insurance exceeding the entire value nearly $2,500.
W. H. Runkle, the agent who purchased the property for Wich and others, testified in regard to its value, at the time of purchase, December 12, 1888, as follows: “I made the investigation, and found that the building and real estate, machinery, fixtures, barn, and all other property, personal or real, belonging to said company, could be bought for $12,500;” — and he bought it at that price. After the purchase he, as agent, expended in improvements and for necessary articles $1,026.95, making the whole amount $13,876.95.
Appellee testified: “ I lost $15,000 by the fire. * * * I made improvements to the extent of about $1,600. * * * (Runkle, the agent, made it $1,126.95.) The $15,000 I spoke about represents the amount paid in running the brewery. The total amount I paid out of my pocket I do not know, as it was a losing business.” He also testified that the notes of McCandless for the purchase of the property had not been paid at the time of the trial. According to the testimony of appellee and Runkle, it will be seen that the verdict and judgment not only covered the full value of the property, but the losses sustained in carrying on the business.
*116 3d. By a provision in the policy, it was to become void in case there was any change of title, unless the fact was communicated to the company. About the 15th of August the other parties conveyed their interests to appellee, and he became sole owner. The fact was not communicated. The property was destroyed by fire September 5th.
In the application appellee stated the business was profitable. That it never had been profitable was shown by the testimony of appellee and others. It was also shown that business was suspended for a long time, and there had been no watchman, the reason being that the men were driven away by the ghost of some poor fellow that chose the place for the purpose of suicide.
The instructions given by the court, 1 to 7, both inclusive, are correct statements of the law, with the exception that in the second and third the court said: “ If you find him (John Wich) the legal or equitable owner of the property,” etc.
There was no evidence whatever of equitable ownership. The title as shown was purely legal; vested, first, in the four, and later in appellee, as sole owner. To submit the question of equitable ownership was error.
The ninth instruction is correct, — a clear statement of the law of the case. The 8th, 10th and 11th were faulty, and at variance with others given, allowing the jury to relieve the appellee from the force or effect of his contract if they found he signed it at the suggestion of the solicitor, and did not know what it contained, etc. The 14th was particularly faulty, in effect allowing the. jury to find the entire title in appellee by virtue of some alleged verbal arrangement, whereby their title was to fail in the future, on failure to pay their respective shares of the purchase.
The judgment will be reversed, and cause remanded for a new trial.

Reversed.