## MAIER v. FIDELITY MUT. LIFE ASS'N.

(Circuit Court of Appeals, Sixth Circuit. February 2, 1897.)

### No. 385.

LIFE INSURANCE—FALSE STATEMENTS IN APPLICATION—ANSWERS BY AGENT.

The F. Ins. Co. issued a policy on the life of M., which was recited on its face to be issued in consideration of the application, which was made a part of the policy, and a copy of which was thereto attached, and to be subject to the conditions thereon indorsed, one of which was that, if any statement in the application was false, the policy should be null and void. The application concluded with a provision that all statements contained in it, by whomsoever written, were warranted to be true, and that no verbal statement, to whomsoever made, should modify the contract. Upon the trial of an action on the policy, it appeared that M. made the application at the solicitation of an agent of the insurance company; that such agent had a short conversation with him when he was in a hurry, and, after answering a few questions, he told the agent to finish the application himself, and he would sign it and leave it for the agent to finish, which the agent did; that the answers to questions in the application as to M.'s health and his habits of drinking were totally at variance with the facts, which were such as, if known, to make the acceptance of M.'s application very unlikely. *Held*, that the insurance company was not estopped to deny the validity of the policy, and a verdict in its favor was properly directed by the court.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

James H. Pound, for plaintiff in error.
Alfred Lucking, for defendant in error.

Before HARLAN, Circuit Justice, and TAFT and LURTON, Circuit Judges.

HARLAN, Circuit Justice. This is an action upon a policy of life insurance for $10,000, issued September 30, 1892, by the Fidelity Mutual Life Association of Philadelphia, upon a written application to that association by the assured, Martin Maier, of Detroit, Mich. The beneficiary named was the wife of the assured, the present plaintiff in error.

In the answers to questions embodied in the application, which was made September 26, 1892, it was stated, among other things, that the assured was then in "good health," and "free from any and all diseases, sicknesses, ailments, or complaint, trivial or otherwise"; that he had "never had or been afflicted with any sickness, disease, ailment, injury, or complaint"; that the last physician he had consulted, or who prescribed for him, was Dr. Morse Stewart, of Detroit, two years previously, and that his ailment then was "toothache"; that he had not consulted, or been prescribed for by, any other physician or medical man during the previous 10 years; and that he did not use, and never used, spirits, wines, or malt liquors, and had always been temperate and sober.

The policy recites that it was issued in consideration of the application, "made part hereof, and a copy of which is hereto attached," and subject to all the requirements stated, "and the conditions hereon indorsed." One of the conditions indorsed on the back of the policy is that, "if any statement contained in the application on which this policy is issued be untrue in any respect, then this policy, except as herein provided, shall be ipso facto null and void."

The application thus concluded:

"I hereby agree and bind myself as follows: That the statements above made or contained, by whomsoever written, are material to the risk, and warranted to be true; that I have signed this application in my own handwriting; that * * * all provisions of law in conflict with or varying the terms of this agreement and policy applied for are hereby expressly waived, and the policy issued hereon shall not become binding on the association until the first payment due thereon has been actually received by the association or its authorized agent during my lifetime and good health; that no verbal statement, to whomsoever made, shall modify this contract, or in any manner affect the rights of the association, unless the same be reduced to writing, and be presented to and approved by the officers of the association at the home office, in Philadelphia, no agent or examiner having any power or authority to make or alter contracts, waive forfeitures, or grant credit; that * * * this application shall be the sole basis of the contract with the association, if a policy be issued hereon; and that, if any concealments or untrue statements or answers be made or contained herein, then the policy of insurance issued thereon and this contract shall be ipso facto null and void: provided, always, that, if the necessary payments be made to keep said policy in force, it shall be incontestable, except as herein set forth.

"Dated at Detroit this 26th day of September, 1892.     Martin Maier.
"In presence of D. A. Rothschild, Soliciting Agent."

Immediately below the attestation to the application the following direction was printed with a rubber stamp:

"Review the answers to questions given in this copy of your application, and, if any correction has been made, advise the president of the association."

The plea was the general issue, with notice, according to the Michigan practice, that the defendant would give in evidence, by way of defense, the above application of the assured, which, it was alleged, was duly signed by him and delivered to the defendant, and "on the faith of which, and in full reliance upon the statements thereon made, the said defendant did issue to the said Martin Maier the policy of insurance declared upon."

The notice further stated that the company would show on the

trial that the application and statements therein were false and fraudulent in many particulars; among others, in the following: That Maier was not at the time of his application in good health, and free from any and all sickness, ailments, or complaints, but was in bad health, and suffering from epilepsy, attacks of an epileptoid character, fits, convulsions, habitual constipation, alcoholism, softening of the brain, nervous prostration, neuresthenia and kindred troubles, and other diseases; that he had been afflicted with numerous sicknesses, diseases, ailments, and injuries, including those above specified, and with a number of injuries, among others, injuries received on or about January 19, 1887, August 2, 1889, and July 10, 1890, all of which were serious; that he had consulted and been prescribed for by numerous physicians during the period named in the application,—among others, by Dr. George Duffield, Dr. James Campbell, Dr. Wilcox, Dr. W. H. Poole, Dr. Yarnell, and by others unknown to defendant, all within said period; that the statement that he had consulted Dr. Morse Stewart, about two years prior to his application, for toothache only, was false and fraudulent, as he had consulted said Stewart, who prescribed for him, within two years of that date, for an attack of epilepsy, or an attack of an epileptoid character, and likewise had been treated for different serious troubles during the previous 10 years by that physician, who had attended and prescribed for him on various occasions during that period; that the statement made by said deceased in his application, that he did not then use, and never had used, spirits, wines, or malt liquors, and had always been temperate and sober, was false and fraudulent, in that he had used spirits, wines, and malt liquors, and each of them, and had not always been temperate and sober.

It appeared in evidence that Maier made the application for insurance at the suggestion of one Rothschild, who testified that he was at that time working for Mr. Montgomery, the Detroit agent of the defendant. But it does not appear that Montgomery had any knowledge of Rothschild's effort to secure an application from Maier. Rothschild testified:

"I met Mr. Maier in the street, and I asked him to give me his application. He was in a hurry, and we stepped in a clothing store on Michigan avenue, and he says, 'Hurry up. I haven't much time.' I asked him a few questions. He finally said, 'Well, you fill them up yourself.' I asked him about drinking, and he said, 'I am not drinking anything at present, you understand,' so I didn't put that in, and all the other questions accordingly. * * * He was in a hurry, only had two or three minutes to write it up, and he says, 'You finish it.' He says, 'I will sign my name now, and you finish it, and I will go away.' * * * Q. What, if anything, did you say to him about his having been afflicted with sickness or disease or ailments? A. He told me he had some toothache, and I put it down. Q. What, if anything, did you say to him as to who treated him for it? A. He said, 'Dr. Morse Stewart,' and I put that down. * * * Q. What, if anything, did you say to him about intoxicating liquors? A. I knew he did not drink any more at that time. Q. Did you, or did you not, say anything to him about it? A. Yes. Q. At that time? A. Well, no, I didn't, as he told me he didn't drink anything at the time when I took the insurance. Q. Did you say that Mr. Maier told you so at that time? A. I don't know as he did. I knew he didn't drink anything at that time. Q. Now, my question is, did he say anything on that subject at that time? A. No, he didn't say anything." On cross-examination he was asked if

he did not know that Maier had been to the Keeley Cure for drunkenness, and he answered: "No, sir, I didn't know; I heard he was there." Being asked whether he did not know that Maier had been convicted in the police court for drunkenness, he answered: "I don't know anything about it. I knew when he came out of the Keeley Cure." Again: "Q. And he did not use, and had never used, spirits, wines, and malt liquors, and had always been temperate and sober. Now, just what did he say to you about that? A. Only asked him whether he was drinking, and he says, 'No,' he didn't drink any more, and I cut that off. I knew he was not drinking, and I didn't think it was material to put in that."

The evidence of Rothschild, in connection with other proof in the cause, leaves no doubt that if the facts as to Maier's habits and condition had been fairly disclosed, in answer to the questions contained in the printed application, the company would have declined to issue the policy. Rothschild, therefore, according to the weight of the evidence, suppressed the material facts; and, by reason of such suppression, Maier obtained the policy, and the unfaithful solicitor realized his commissions.

Nor can it be doubted, under the evidence, that Maier himself knew that he was not a proper subject of life insurance. It was shown from official records that on the 10th day of September, 1891, July 1, 1892, and September 10, 1892, respectively, he was tried in the police court of Detroit, and found guilty of drunkenness, and that on the 26th day of September, 1892,—the very day of his application for insurance,—a warrant was taken out charging him with being a disorderly person, in that he was a tippler, and, having been tried on the succeeding day in that court, was found guilty, and fined $7 and costs, $30, or 45 days in the Detroit house of correction. The fine and costs were paid. It was also shown that in January, 1892, he was an inmate of an institute at Northville, Mich., and was there treated by Dr. Yarnell for "alcoholism, or excessive drinking of alcoholic drinks." According to the testimony of that physician, his disease had then progressed "to the extent that his brain was considerably defective; very strong tendency towards softening of the brain, or paresis." The evidence further showed, beyond dispute, that in 1890, and again in 1891, he was often visited and treated by Dr. Stewart for epileptic attacks, and that for some years prior to his application he was frequently, if not habitually, in a state of intoxication. There was therefore no escape from the conclusion that the statements in the application that Maier never had been afflicted with any sickness, disease, ailment, injury, or complaint; that he had not consulted or been prescribed for by any physician, except Dr. Stewart, during the preceding 10 years; and that he did not use, and had never used, spirits, wines, or malt liquors, and had always been temperate and sober,—were untrue.

But it is contended by the plaintiff that the falsity of these statements cannot be attributed to the assured, so as to render the policy void, because the answers to the questions propounded to him were in fact prepared by the agent of the insurance company, and that the company is estopped to deny the validity of the policy, upon the grounds stated, if its agent knew the facts and

suppressed them when preparing the answers, or failed, fraudulently or negligently, having an opportunity to do so, to bring out the facts called for by the questions embodied in the application.

We cannot accept this view of the contract between the parties. If the assured authorized the soliciting agent to prepare his answers to the questions propounded, and thereafter signed the application so prepared, neither he nor any one claiming the benefit of the policy ought to be heard to say that he did not read the answers, or know their contents before signing the application. His attestation of the application by his signature was a representation to the company that the answers were true; for, by the terms of his application, he stipulated that the statements made in answer to questions, "by whomsoever written," were material to the risk, and warranted to be true, and, if any concealments or untrue statements or answers were made, the policy, as well as the contract evidenced by it, should be ipso facto null and void. And when the accused accepted a policy declaring upon its face that it was issued in consideration of the application made part of the policy, and subject to the conditions indorsed on the policy, the contract became complete, and its terms are to be respected, and cannot, in an action on the policy, be ignored or made of no effect. It is an essential fact in the case that in the body of the contract evidenced by the policy are found recitals which make the application, as well as the conditions indorsed on the policy, part of the contract of insurance.

It was said in argument that the company should not be permitted to take advantage of the misconduct or wrong of its own agent. But the law did not prohibit the company from taking such precautions as were reasonable and necessary to protect itself against the frauds or negligence of its agents. If the printed application used by it had not informed the applicant that he was to be responsible for the truth of his answers to questions, and if the want of truth in such answers were wholly due to the negligence, ignorance, or fraud of the soliciting agent, a different question would be presented. But here the accused was distinctly notified by the application that he was to be held as warranting the truth of his statements, "by whomsoever written." Such was the contract between the parties, and there is no reason in law or in public policy why its terms should not be respected and enforced in an action on the written contract. It is the impression with some that the courts may, in their discretion, relieve parties from the obligations of their contracts, whenever it can be seen that they have acted heedlessly or carelessly in making them. But it is too often forgotten that in giving relief, under such circumstances, to one party, the courts make and enforce a contract which the other party did not make or intend to make. As the assured stipulated that his statements, which were the foundation of the application, were true, by whomsoever such statements were written, and as the contract of insurance was consummated on that basis, the court cannot, in an action upon the contract, disregard the express agree-

ment between the parties, and hold the company liable, if the statements of the assured—at least, those touching matters material to the risk—are found to be untrue.

The views we have expressed are in harmony with the decisions of the supreme court of the United States. In Insurance Co. v. Fletcher, 117 U. S. 519, 529, 531, 534, 6 Sup. Ct. 837, the defense was that certain statements and representations respecting his health and condition were made by the assured in his application, the truthfulness of which he warranted, and agreed that they should be the basis of any contract between him and the company, and that the policy should be void if such statements, or any of them, were in any respect untrue, and all moneys paid on it forfeited. The policy in that case was accompanied by a copy of the application, and recited that it was issued in consideration and upon the faith of the statements and representations contained in the application. The plaintiff in the suit pleaded that the answers in the application had been prepared by the agents of the company, and that they had not properly put down what he had said to them in answer to questions. The supreme court said:

"It is, of course, not necessary to argue that the agent had no authority from the company to falsify the answers, or that the assured could acquire no right by virtue of his falsified answers. Both he and the company were deceived by the fraudulent conduct of the agent. The assured was placed in a position of making false representations in order to secure a valuable contract, which, upon a truthful report of his condition, could not have been obtained. By them the company was imposed upon, and induced to enter into the contract. In such a case, assuming that both parties acted in good faith, justice would require that the contract be canceled and the premiums returned. As the present action is not for such cancellation, the only recovery which the plaintiff could properly have, upon the facts he asserts, taken in connection with the limitation upon the powers of the agent, is for the amount of the premiums paid, and to that only would he be entitled by virtue of the statute of Missouri. But the case, as presented by the record, is by no means as favorable to him as we have assumed. It was his duty to read the application he signed. He knew that upon it the policy would be issued, if issued at all. It would introduce great uncertainty in all business transactions, if a party making written proposals for a contract, with representations to induce its execution, should be allowed to show, after it had been obtained, that he did not know the contents of his proposals, and to enforce it, notwithstanding their falsity as to matters essential to its obligation and validity. Contracts could not be made, or business fairly conducted, if such a rule should prevail, and there is no reason why it should be applied merely to contracts of insurance. There is nothing in their nature which distinguishes them in this particular from others. But here the right is asserted to prove, not only that the assured did not make the statements contained in his answers, but that he never read the application, and to recover upon a contract obtained by representations admitted to be false, just as though they were true. If he had read even the printed lines of his application, he would have seen that it stipulated that the rights of the company could in no respect be affected by his verbal statements, or by those of its agents, unless the same were reduced to writing and forwarded with his application to the home office. The company, like any other principal, could limit the authority of its agents, and thus bind all parties dealing with them with knowledge of the limitation. It must be presumed that he read the application, and was cognizant of the limitations therein expressed." Referring to the previous cases of Insurance Co. v. Wilkinson, 13 Wall. 222, and Insurance Co. v. Mahone, 21 Wall. 152, the court said: "In neither of these cases was any limitation upon the power of the agent brought to the notice of the assured. * * * Where such agents, not limited in their authority, undertake to prepare applications and take down answers, they will be deemed as acting for the companies. In such cases it may

well be held that the description of the risk, though nominally proceeding from the assured, should be regarded as the act of the company. Nothing in these views has any bearing upon the present case. Here the power of the agent was limited, and notice of such limitation given by being embodied in the application, which the assured was required to make and sign, and which, as we have stated, he must be presumed to have read. He is therefore bound by its statements." Again: "There is another view of this case equally fatal to a recovery. Assuming that the answers of the assured were falsified as alleged, the fact would be at once disclosed by the copy of the application, annexed to the policy, to which his attention was called. He would have discovered by inspection that a fraud had been perpetrated, not only upon himself, but upon the company, and it would have been his duty to make the fact known to the company. He could not hold the policy without approving the action of the agents, and thus becoming a participant in the fraud committed. The retention of the policy was an approval of the application and of its statements. The consequences of that approval cannot, after his death, be avoided."

It is a mistake to suppose that any different views are expressed in Insurance Co. v. Chamberlain, 132 U. S. 304, 310, 311, 10 Sup. Ct. 87. That case turned upon its special facts, and the decision was controlled by a statute of Iowa, one section of which provided that:

"Any person who shall hereafter solicit insurance, or procure applications therefor, shall be held to be the soliciting agent of the insurance company or association issuing a policy on such application, or on a renewal thereof, anything in the application or the policy to the contrary notwithstanding."

The court said:

"This statute was in force at the time the application for the policy in suit was taken, and therefore governs the present case. It dispenses with any inquiry as to whether the application or the policy, either expressly or by necessary implication, made Boak the agent of the assured in taking such application. By force of the statute, he was the agent of the company in soliciting and procuring the application. He could not, by any act of his, shake off the character of agent for the company. Nor could the company, by any provision in the application or policy, convert him into the agent of the assured. If it could, then the object of the statute would be defeated." Again, in the same case: "The purport of the word 'insurance' in the question, 'Has the said party any other insurance on his life?' is not so absolutely certain as, in an action upon the policy, to preclude proof as to what kind of life insurance the contracting parties had in mind when that question was answered. Such proof does not necessarily contradict the written contract. Consequently, the above clause, printed on the back of the policy, is to be interpreted in the light of the statute and of the understanding reached between the assured and the company by its agent when the application was completed, namely, that the particular kind of insurance inquired about did not include insurance in co-operative societies. In view of the statute and of that understanding, upon the faith of which the assured made his application, paid the first premium, and accepted the policy, the company is estopped, by every principle of justice, from saying that its question embraced insurance in co-operative associations. The answer of 'No other,' having been written by its own agent, invested with authority to solicit and procure applications, to deliver policies, and, under certain limitations, to receive premiums, should be held as properly interpreting both the question and the answer as to other insurance."

While the issues present questions of general law, upon which this court may exercise an independent judgment, we are gratified to find that well-considered decisions of the supreme court of Michigan are to the same general effect. In Cleaver v. Insurance Co., 65 Mich. 527, 531, 533, 32 N. W. 660, it appeared that a policy of fire insurance provided that it should be void if other insurance on the property was procured without the consent of the company

written upon the policy. Additional insurance was procured, with the knowledge and assistance of the company's agent, but the company's consent was not indorsed on the policy, nor did it receive notice of such insurance. The policy declared, as a part of the contract, that the agent of the company had no authority to waive, modify, or strike from the policy any of its printed conditions, nor revise the policy if it should become void by reason of the violation of any of its conditions. It also provided:

"And it is hereby mutually understood and agreed by and between this company and the assured that this policy is made and accepted upon and with reference to the foregoing terms and conditions, all of which are hereby declared to be a part of this contract, and are to be used and resorted to in order to determine the rights and obligations of the parties hereto in all cases not herein otherwise specially provided for in writing."

### The supreme court of Michigan said:

"It is claimed here that the action of the agent was the action of the company, and that such action created an estoppel. But it is not shown that the agent had any authority to indorse upon the policy the written consent to additional insurance, or to waive in any way the provisions of the policy. On the contrary, the policy delivered to the insured expressly states that such agent 'has no authority to waive, modify, or strike from the policy any of its printed conditions: * * * nor, in case this policy shall become void by reason of the violation of any of the conditions thereof, has the agent power to revive the same.'" After distinguishing that case from Kitchen v. Insurance Co., 57 Mich. 135, 23 N. W. 616, the court proceeded: "If the agent, under the circumstances of this case, by filling out the application for the Lansing insurance, and saying it was all right, can estop the defendant company from raising and enforcing this defense, then the clauses prohibiting the agent from waiving the conditions of the policy, or from reviving it after it has become null and void, are rendered entirely useless and nugatory." Again: "This is not a case where the insured had a right to rely upon the action of the agent, or to presume that his action was known to the company, and ratified by them, as in Insurance Co. v. Fay, 22 Mich. 467. The policy received by Cleaver distinctly pointed out the way to procure additional insurance without voiding the first insurance, and expressly prohibited the agent from waiving, altering, or modifying the process of obtaining further insurance. The fact that the plaintiff may not have read the printed conditions of his policy, and relied, in ignorance of them, upon the implied or assumed powers of the agent, cannot help him. It was his business to know what his contract of insurance was, and there can be no difference in this respect between an insurance policy and any other contract. In the absence of any fraud in the making of the same, and none is claimed in this case, the insured must be held to a knowledge of the conditions of his policy, as he would be in the case of any other contract or agreement. When the policy of insurance, as in this case, contains an express limitation upon the power of the agent, such agent has no legal right to contract as agent of the company with the insured, so as to change the conditions of the policy, or to dispense with the performance of any essential requisite contained therein, either by parol or writing; and the holder of the policy is estopped, by accepting the policy, from setting up or relying upon powers in the agent in opposition to limitations and restrictions in the policy. Merserau v. Insurance Co., 66 N, Y. 274; Cator v. Trust Co., 33 N. J. Law, 487. The circuit judge, as the case stood in the court below, should have directed a verdict in favor of the defendant."

In Cook v. Insurance Co., 84 Mich. 12, 17, 18, 47 N. W. 568, 570, which was an action upon an accident policy, and in which the defense was a false statement by the assured as to his habits, the policy purported to have been issued in consideration of the statement of facts warranted in the application to be true, and upon conditions printed upon the back of the policy, which, it was pro-

vided, could not be waived or altered by the agent. The court, after distinguishing the case before it from Insurance Co. v. Hall, 12 Mich. 202, and Insurance Co. v. Olmstead, 21 Mich. 246, in which cases it said, "The power of the agents was in no manner limited by the terms of the policies themselves," proceeded:

"In the present case the policy provides that the agent of the company cannot waive or alter any of the agreements and conditions printed on the back of the policy. This question was fully discussed by Mr. Justice Morse in Cleaver v. Insurance Co., 65 Mich. 527, 532, 32 N. W. 660, 662, and it was there said: 'It cannot be successfully maintained but that the company has the right and the power to restrict as it may choose the powers and duties of its agents, and, when the authority is expressly limited and restricted by the policy which the insured receives, there can be no good reason, either in law or equity, why such limitations and restrictions shall not be considered as known to the insured and binding upon him.'" "The court below on the trial proceeded on the theory that notice to Mr. Eadus or to Mr. Patton was notice to the company, and charged the jury that the defendant had a right to waive the conditions of the policy, and that, by issuing the policy to Mr. Cook with this knowledge on the part of its agents and receiving the premiums, it waived the conditions relating to intoxication. This was not a statement of the law applicable to the case, as laid down in Cleaver v. Insurance Co., supra, and to which we must adhere."

In Gould v. Insurance Co., 90 Mich. 302, 51 N. W. 455 (Id., 90 Mich. 308, 52 N. W. 754), the court, after observing that the plaintiff, in accepting the policy of insurance, and in her subsequent dealing with the agent relative to the furnishing of proofs of loss, must be presumed to have had knowledge of the agent's want of power to waive any of the terms and conditions of the policy, said:

"This restriction upon the agent's power to waive the provisions of the policy was plainly printed upon the face of the policy, and it cannot be successfully maintained that the company had no right to restrict the powers and duties of its agent. It must be held in the present case that this power was expressly limited by the policy, and known to the insured and binding upon her. The case falls clearly within the ruling of this court in Cleaver v. Insurance Co., 65 Mich. 527, 32 N. W. 660. As it was the duty of the court, under this holding, to direct the verdict in favor of the defendant, we need not pass upon the other questions raised."

See, also, Mallory v. Insurance Co., 97 Mich. 416, 56 N. W. 773.

After this cause was argued and submitted, the attention of the court was called to the recent decision of the supreme court of Michigan in the case of Van Houten v. Insurance Co., 68 N. W. 982. The opinion has not yet appeared in the published Reports, but we have been furnished with a copy of it for examination. Nothing decided in that case is in conflict with anything said in the case before us. The contract in the Van Houten Case does not seem to have contained any provision warranting the statements in the application to be true, "by whomsoever written." The applicant answered all the questions that were propounded to him, and, under the circumstances disclosed, had the right to assume that the company did not require any answers by him to questions not propounded to him by the agent. The company's representative assumed, without authority from the applicant, to answer for the applicant questions to which the attention of the latter was not called. The answers made to the questions put to the applicant were not impeached on any ground. The claim was that

·the answers made by the agent of the company upon his own responsibility, and based upon his own knowledge of the condition of the applicant, and not brought to the attention of the applicant, were untrue. The supreme court of Michigan recognized the general rule that every one is presumed to have read what he signs. But the facts in that case seem to have been such as to authorize the submission to the jury of the question whether the applicant was not misled by the conduct of the company's agent into the belief that what he was asked to sign and did sign embodied only his own answers to the questions actually propounded to him. The supreme court of Michigan said:

"The agent in this case had known the deceased for twenty-five years, had no knowledge of his being ill before the illness which resulted in his death, and, relying upon his own knowledge of the life of the assured, chose to answer these questions himself without interrogating him or calling his attention to him, or informing him that there was any importance to be attached to them. In fact, it does not appear that he informed him that there were any other questions to answer, while those he answered were answered correctly. The applicant had the right to assume that all the questions were asked, and was under no obligation to read the paper to ascertain if there were others. The application was in very small type, and very closely printed. The questions and answers were below the application, and were twenty-two in number. While every person is presumed to have read what he has signed, still we think that there was testimony in this case from which the jury might legitimately infer that the assured was misled by the agent of the defendant in making the application."

This is not inconsistent with anything determined in the present case, nor with the prior adjudications of the supreme court of Michigan in the cases above cited.

We are of opinion that the circuit court, in conformity with the established practice in the courts of the United States, as well as in the courts of Michigan, properly instructed the jury that upon the evidence, and, in view of the legal principles applicable to the contract in suit, the defendant was entitled to a verdict. There was no ground whatever upon which a verdict for the plaintiff could possibly have been sustained, and therefore it was the duty of the court, upon motion, to give a peremptory instruction for the defendant. Insurance Co. v. Randolph (just decided) 78 Fed. 754; Railway Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463, 465, et seq. A verdict for the plaintiff could not have been upheld unless it was true that the preparation by the company's soliciting agent of the alleged false answers in the application, or the agent's knowledge of all the facts, estopped the company from relying upon the provision of the contract declaring the policy void if the statements in the application, by whomsoever written, were untrue. In view of the undisputed facts, and as a verdict for the plaintiff would have been utterly indefensible under any reasonable view of the evidence, the question whether the plaintiff could recover could not be said to have depended upon the weight or preponderance of evidence, but became a question of law, which was correctly decided by the circuit court when it directed a verdict for the company.

Judgment affirmed.