HAMILTON v. FIDELITY MUT. LIFE ASS'N OF PHILADELPHIA, PA.

(Supreme Court, Appellate Division, Fourth Department. March 26, 1898.)

INSURANCE—APPLICATION—VERBAL STATEMENTS.

An assured in an application for life insurance falsely represented that he had always been temperate, and never had used liquors except two or three glasses of beer a day. The application further stipulated that no verbal statement should modify the contract unless reduced to writing, and presented to and approved by the officers of the association, and that if any concealment or untrue statement was made therein, then the policy and this contract should be ipso facto void. This application was signed by the assured, and by the terms of the policy which he accepted it was made a part of it. *Held*, in an action on the policy, that defendant was not bound by verbal statements made by the assured to its agent, not appearing in the application, showing the truth in regard to his drinking habits.

Appeal from trial term, Erie county.

Action by Lucie Hamilton against the Fidelity Mutual Life Association of Philadelphia, Pa., upon a life insurance policy. Judgment for plaintiff, and defendant appeals. Reversed.

Verdict for $2,213.33 taken for the plaintiff at a trial term in Erie county. Motion for a new trial on the minutes denied. Appeal from the order denying the motion and from the judgment entered upon the verdict. Action to recover upon a certificate of membership in the defendant, issued by it on the 9th day of January, 1895, in consideration of $11.26 paid that day, and premiums to be paid subsequently, on the life of James Hamilton, and an agreement to pay, in the event of his death, to his wife, Lucie Hamilton, the plaintiff, $2,000. The assured died on the 17th day of April, 1895. The answer of the defendant admits that it "did receive one James Hamilton, of Buffalo, New York, as a member of defendant association on certain terms and conditions, and did issue its certain policy of insurance upon the life of said James Hamilton." The answer

alleges: "Said James Hamilton falsely represented and set forth in his application for insurance, upon which said policy was issued, and which was incorporated in and made a part of said policy, that he, said James Hamilton, did not then use, and never had used, spirits, wines, malt liquors, or narcotics, and had always been temperate and sober, except that he used about two or three glasses of beer a day; that, as a matter of fact, said Hamilton, at the time of executing said application, and for a long time prior thereto, had been and was addicted to the use of spirits, wines, malt liquors, and narcotics, and used the same or some of them excessively, and, at the time of making the same knew the said statements in said application relating thereto were false, and said Hamilton so made said false statements as aforesaid for the purpose of inducing this defendant to issue said policy; that all of the statements so made as aforesaid in said application were material, and, relying upon the same as true, this defendant did issue said policy as aforesaid; that, by reason of said false and fraudulent statements so made by said Hamilton in said application as aforesaid, said policy became prior to, and was at the time of, said James Hamilton's death, and now is, null and void." The policy issued by the defendant contained the following language: "In consideration of the application for this policy, which is made a part hereof, and a copy of which is hereto attached, and the payment to said association of eleven and $26/100$ dollars upon the ninth day of the month of January, April, July, and October in every year for the period of fifteen years, * * * does hereby receive James Hamilton, of Buffalo, * * * as a member of said association, and issues this policy of insurance, and hereby promises to pay the sum of two thousand dollars to his wife, Lucie Hamilton; * * * subject, however, to all the requirements hereinafter stated, and the conditions hereon indorsed, which are hereby referred to, and made a material part of this contract." In the conditions indorsed on the policy are the following: "Fifth. No agent of the association has any power or authority to make, alter, or discharge contracts, waive forfeitures, or grant credits; and no alteration of the terms of this contract shall be valid, and no forfeiture hereunder shall be waived, unless such alteration or waiver be in writing, and be signed by the president of the association. Sixth. If any statement contained in the application on which this policy is issued be untrue in any respect, then this policy, except as herein provided, shall be ipso facto null and void." The application in writing made by James Hamilton, and by him signed, is dated the 20th day of December, 1894, and in the eleventh subdivision thereof appears the following: "(11) That I do not use, and never have used, spirits, wines, malt liquors, or narcotics, and have always been temperate and sober, except as stated below: I use about two or three glasses of beer a day." It also contained the following: "I hereby agree and bind myself as follows: That the truthfulness of the statements above made or contained, by whomsoever written, are material to the risk, and are the sole basis of the contract with the said association; that I have signed this application in my own proper handwriting; * * * that no verbal statement, to whomsoever made, shall modify this contract, or in any manner affect the rights of the association, unless the same be reduced to writing, and be presented to and approved by the officers of the association at the home office in Philadelphia, no agent or examiner having any power or authority to make or alter contracts, waive forfeitures, or grant credit; * * * and that, if any concealment or untrue statement or answer be made or contained herein, then the policy of insurance issued hereon and this contract shall be ipso facto null and void."

Argued before HARDIN, P. J., and FOLLETT, ADAMS, GREEN, and WARD, JJ.

Wilber E. Houpt, for appellant.

Moses Shire, for respondent.

HARDIN, P. J.    The defendant was organized under and in pursuance of the laws of Pennsylvania, and is known as a co-operative assessment company, and it had in the year 1895 numerous by-laws.    In the eleventh answer made in the application, James Hamilton states that he did not use, and never had used, spirits, wines, malt liquors, or

narcotics, except that he used two or three glasses of beer a day; and he, in effect, also stated that he had always been temperate and sober. Defendant called a large number of witnesses, who testified to the intemperate habits of the insured. The witness Rochvot, a justice of the peace, had lived in the same house with the deceased for about two years, and he testified that he saw him intoxicated frequently, and that he had seen him drink a great many times, and that he always took whisky. The witness Lines gave testimony to the effect that he was a saloon keeper, and that Hamilton had frequently been in his saloon, and drank whisky, and that the witness had seen him intoxicated on several different occasions, so much so that the witness refused to sell him more drinks, and that Hamilton frequently bought whisky at his place, and took it away in a bottle. The witness Francis testified that he had seen Hamilton under the influence of liquor and intoxicated quite frequently, and that he had seen him stagger from intoxication, and of his leaving jobs after being more or less intoxicated; that he had seen him drink whisky, while at work, out of a bottle or flask. The witness Hartell testified to having seen Hamilton drink, and to his asking him to come to his room and drink with him, and that he had seen Hamilton under the influence of liquor a great many times. The witness Precor testified that he had known the deceased a couple of years, and that he had seen him in Murphy's saloon on the morning that he was hurt, standing at the bar; and that he had seen Hamilton intoxicated two or three times, near his house, on the street. The witness Van Everding testified that he had seen Hamilton at Murphy's saloon when he was intoxicated, and that he always drank whisky. Gerard Van Everding, son of the last witness, testified that he had known Hamilton four or five years before he died, and that he saw him the Sunday that he was injured, in Murphy's saloon, and that he was intoxicated; that just prior to his injury Hamilton started to go downstairs, and the witness took him by the arm, and told him it was not safe to go down first, and that the deceased insisted upon going down first, and that he then fell downstairs, and received the injuries from which he, three days after, died. The witness Plembel testified that he had seen Hamilton at his saloon at different times for several years, and had seen him drink and become intoxicated a number of times, and that in the morning he used to drink whisky, and was in the habit of visiting that saloon for a couple of years daily, and the witness had refused him drinks when he came there pretty full on as many as a dozen times. Dr. Crawford testified that he made an examination of the deceased, and he found that his condition at the time of the injury was such that it was impossible to tell whether he was suffering most from alcohol or concussion of the brain, and that he was sure he had been drinking. The witness Drake was a laborer, and had worked with the deceased for several years, and he testified that he had seen him drink as many as a dozen times, and that he had seen the deceased have a bottle of whisky with him, and seen him drink out of it, and had seen him when he was "pretty full," "about half tight, when at his work; and sometimes he would go away from his work when he got so tight he wasn't able to work." Murphy testified that he kept a saloon at No.

288 South Division street in the month of April, 1895, and that Hamilton was hurt at his place by falling downstairs; that he came to the witness' saloon about 6 o'clock in the morning, and took a drink of whisky; and the witness adds that it is his recollection that the deceased came pretty nearly every morning to get a drink of whisky. The witness Grodzinski testified that he had lived next door to Hamilton in the years 1889 and 1890, and that he had seen him intoxicated 50 times. The witness Cosgrif testified that he had known Hamilton for 20 years, and had seen him under the influence of liquor while he was at work at different times, and that he had frequently seen him "pretty full," and that he had met him on the street when he was intoxicated. Chrisdall, a dock-wholloper, was acquainted with Hamilton about two years, and was with him on the day he received the injury from which he died. He testifies that he saw Hamilton drunk once about six or seven months before he was killed. After this evidence was given, the plaintiff called several witnesses who testified to numerous occasions when they had seen the deceased when he was not intoxicated. Several of them, however, admitted that Hamilton drank whisky. The preponderance of the evidence is to the effect that Hamilton was not a temperate and sober man, but that he was addicted to the use of intoxicating drinks to an extent greatly beyond that specified in his answer to the eleventh interrogatory in the application signed by him.

In the course of the charge delivered by the learned trial judge, after referring to the answer to the eleventh interrogatory, he said:

"It is now practically conceded that this is not a truthful statement of the habits of the deceased. In addition to using beer, he did use whisky, and, if he desired it, other sorts of liquor. But it is the claim of the plaintiff that the answers made by Mr. Hamilton to the agent were truthful in every respect, and that they were not put down by the agent as they were given, and consequently it is the claim of the plaintiff that she is not responsible for the answers which are contained in this application, and it does not work a forfeiture. Now, in denying the defendant's motion for a nonsuit, also for a direction of a verdict, the court substantially held that, if Hamilton made truthful representations to Smith, Smith being the agent of the defendant company alone, and he put down false answers for any reason, that then they would not avoid the policy of Hamilton, provided that he had no knowledge of it. And that, I charge you, is the law." And further on in his charge he said: "Now, as I have said, if that is true, and he was truthful in his statements to the agent, and the agent has been guilty of misrepresentations, the plaintiff could recover notwithstanding." And the learned trial judge submitted to the jury the question of whether Hamilton, "at the time he made his application, was a temperate and sober man, within the meaning of these terms. * * * If he was not a temperate and sober man, as you understand it, then the plaintiff cannot recover; if he was a temperate and sober man, as is claimed by the plaintiff's counsel, then she can recover."

In response to a request made by the defendant's counsel, the trial judge charged:

"That the undisputed evidence in this case establishes the fact that James Hamilton did, prior to, at the time of, and subsequent to the time of making said application, use other spirits and malt liquors than that of beer."

He also charged, viz.:

"That, under the evidence, the statements contained in paragraph 11 of the application as it was forwarded to the company, and attached to the policy, were false and untrue."

50 N.Y.S.—34

And he also charged that all the statements contained in said application were material to the risk.    He refused to charge:

"That the defendant is not bound by any verbal statement made by James Hamilton to Matthew Smith which does not appear in the application."

To that refusal an exception was taken.    He also refused to charge:

"That no verbal statement made by either Hamilton or the plaintiff prior to or at the time of making the application can modify the application and policy as it now stands unless such statement was reduced to writing, and presented to and approved of by the officers of the defendant."

To the refusal to charge the defendant took an exception.

The learned counsel for the respondent concedes that the evidence shows that the deceased "was accustomed to use other liquors besides beer, namely, wine and whisky."    He then contends that the application for the policy was made out by Smith, the company's agent, and that he wrote into the application the answers; and it is argued that the testimony is to the effect that the deceased, when asked as to his drinking, truthfully answered the questions, and told of his drinking beer, wine, or whisky, as he saw fit, and that that fact is established by the testimony of the witness Smith and by the plaintiff, and that Smith supposed he had given a sufficient answer to the question.    And it is contended by the respondent that, as the answer was taken down by Smith, the agent of the company, although it was untruthful, the defendant cannot take advantage of the imperfect and false answers inserted in the application; and he calls our attention to O'Brien v. Society, 117 N. Y. 310, 22 N. E. 954; Peters v. Insurance Co., 10 App. Div. 533, 42 N. Y. Supp. 348; Singleton v. Insurance Co., 11 App. Div. 403, 42 N. Y. Supp. 446; and Kenyon v. Association, 122 N. Y. 247, 25 N. E. 299.    In the last case cited it was said:

"The cases in which knowledge of the agent through whom insurance is taken may operate to defeat the right of the company to avail itself of the fact so known at the time it is taken, are those in which there is no application signed by the assured stating to the contrary of such existing fact, but rests upon a condition expressed in the policy merely; in which case it may be presumed that the statement of the fact in the policy as required by the condition was omitted by mistake, or waived.    Such is not the rule when the alleged breach of warranty is founded upon a misstatement by the assured in his application."

The witness Smith, who took the application, testified, viz.:

"The answers were read over just as I made them.    I read the questions in the application over; then read the answers. * * * Q. And then you said, 'Well, I will put it down, "I use about two or three glasses of beer per day" '? A. Yes, sir.    Q. And you wrote it down, and read it over to him?    A. Yes, sir. * * * Q. Didn't you swear in your affidavit used in this motion for a new trial that he had it before him, and was apparently reading it, for some time?    A. That is what I supposed he was.    Q. Isn't that the fact?    A. That is right."

In the course of the witness' redirect examination he, to some extent, contradicted his testimony on the subject of having read over the statements, and on his recross-examination the witness repeated:

"I did read them to him then [referring to the answers].    Q. You did read them to him then?    A. Yes, sir."

Hamilton signed the application in the presence of the witness Smith.    It must be borne in mind that the application contains an agreement on the part of the insured as to the truthfulness of the statements made.    The application contains the following language, viz.:

"I hereby agree and bind myself as follows: That the truthfulness of the statements above made or contained, by whomsoever written, are material to the risk, and are the sole basis of the contract with the said association; that I have signed this application in my own proper handwriting; * * * that no verbal statement, to whomsoever made, shall modify this contract, or in any manner affect the rights of the association, unless the same be reduced to writing, and be presented to and approved by the officers of the association at the home office in Philadelphia, no agent or examiner having any power or authority to make or alter contracts, waive forfeitures, or grant credit; * * * and that, if any concealment or untrue statement or answer be made or contained herein, then the policy of insurance issued hereon and this contract shall be ipso facto null and void."

Among the conditions annexed to the policy was the following:

"Sixth. If any statement contained in the application on which this policy is issued be untrue in any respect, then this policy, except as herein provided, shall be ipso facto null and void."

The policy declares that all the conditions annexed to it are referred to "and made a material part of the contract."

In Allen v. Insurance Co., 123 N. Y. 6, 25 N. E. 309, it was held that:

"A policy of insurance forms no exception to the general rule that contracts will be enforced according to their terms, and effect will be given to the expressed and evident intention of the parties."

In that case the policy contained provisions that the company would not be bound by any act of, or statement made to or by, any agent or other person which were not contained in the policy; and it is said in the course of the opinion (page 15, 123 N. Y., and page 310, 25 N. E.):

"To these conditions the plaintiff's assent is presumed to have been given by his acceptance of the policy, and there is no reason why he should not be bound by them. If Noble had been the agent of the defendant, it was perfectly competent to stipulate by this contract of insurance that anything done by or known to the agent should be without effect upon the contract, unless made known in writing to the principal."

In Insurance Co. v. Fletcher, 117 U. S. 519, 6 Sup. Ct. 837, it appeared that the agent, without the knowledge of the applicant, wrote down false answers, concealing the truth, which were signed by the applicant without reading them, and by the agent transmitted to the company, and the company thereupon assumed the risk. It was conditioned in the policy that the answers were part of it, and that no statement to the agent not thus transmitted should be binding upon his principal; and a copy of the answers, with these conditions conspicuously printed upon it, accompanied the policy, and the court held that the policy was void, and it was held that it was the duty of the party who was an applicant for insurance, before subscribing the same, to read the answers, "and it will be presumed that he did read them."

In Kabok v. Insurance Co. (Sup.) 4 N. Y. Supp. 718, the application contained a clause declaring that the application should form the basis of, and be a part of, the contract of insurance, and that all answers and statements contained in the application should be taken to be strict warranties; and it was held that any untruthful statements rendered the policy inoperative. In that case there was a clause in the application declaring that the agent in the preparation of the application acted as the agent of the assured, and not of the company, and it was held that the untruthful statements inserted by the agent, either by mistake or otherwise, avoided the policy.

In Bernard v. Association, 14 App. Div. 142, 43 N. Y. Supp. 527, it was held, viz.:

"An insurance company may protect itself against the effect of fraudulent acts upon the part of its agent by covenants in the policy to the effect that the agent, in transcribing the statements and answers of the applicant to questions contained in the application, shall be deemed to be solely the agent of the applicant; and where such provisions, in protection of the insurer, exist, the rule that the insurance companies are bound by the knowledge of their agents, acquired by statements made to them, and that these statements may be proved by parol, has no application."

In Maier v. Association, 24 C. C. A. 239, 78 Fed. 566, an application and policy very similar to the ones that are brought before us in this case were under consideration, and it appeared in that case that Rothschild suppressed material facts, and by reason of such suppression obtained a policy; and it was insisted that, because of the falsity of the statements being attributed to the agent, there could not be a recovery, and that the company was estopped to deny the validity of the policy on the ground that the agent knew the facts, and suppressed them, when preparing the answers, or failed fraudulently or negligently to bring out the facts called for by the questions in the application. Harlan, C. J., who delivered the opinion, said:

"We cannot accept this view of the contract between the parties. If the assured authorized the soliciting agent to prepare his questions propounded, and thereafter signed the application so prepared, neither he nor any one claiming the benefit of the policy ought to be heard to say that he did not read the answers, or know their contents before signing the application. His attestation of the application by his signature was a representation to the company that the answers were true, for by the terms of his application he stipulated that the statements made in answer to questions, 'by whomsoever written,' were material to the risk, and warranted to be true; and, if any concealments or untrue statements or answers were made, the policy, as well as the contract evidenced by it, should be ipso facto null and void; and when the assured accepted a policy declaring upon its face that it was issued in consideration of the application made part of the policy, and subject to the conditions indorsed on the policy, the contract became complete, and its terms are to be respected, and cannot, in an action on the policy, be ignored, or be of no effect. It is an essential fact in the case that in the body of the contract evidenced by the policy are found recitals which make the application, as well as the conditions indorsed on the policy, part of the contract of insurance."

And later on in the course of the opinion it was said:

"As the assured stipulated that his statements, which were the foundation of the application, were true, by whomsoever such statements were written, and as the contract of insurance was consummated on that basis, the court cannot, in an action upon the contract, disregard the express agreement between the parties, and hold the company liable, if the statements of the assured—at least those touching matters material to the risk—are found to be untrue."

A similar doctrine was laid down in Wilkens v. Association, 54 Hun, 294, 7 N. Y. Supp. 589. In that case it was proposed to prove that the assured, at the time he made the application for the insurance, informed the agent of the defendant as to the facts being otherwise than as stated in the application, and it was held that, as the assured, by the application, "took upon himself the entire risk of the truth of the representations made by him, and on the correctness of which the certificate was made to depend," the proof was properly rejected. It was further said that, "where the assured in this manner accepts and

binds himself for the truth of the statements contained in the application, that he cannot be relieved from that result by proof of the fact afterwards made that the agent improperly, as well as untruthfully, filled out the application."

We think the doctrine laid down in the cases to which we have just adverted apply to the case in hand. The assured expressly stipulated that "no verbal statement, to whomsoever made, shall modify this contract, or in any manner affect the rights of the association, unless the same be reduced to writing, and be presented to and approved by the officers of the association at the home office in Philadelphia, no agent or examiner having any power or authority to make or alter contracts, waive forfeitures, or grant credit." The application also contained the further stipulation: "If any concealment or untrue statement or answer be made or contained herein, then the policy of insurance issued hereon, and this contract, shall be ipso facto null and void." The evidence clearly indicates that there was a concealment of material facts, and that there were untrue statements or answers made or contained in the application, and therefore the plaintiff ought not to be permitted to recover upon the contract of insurance issued in consideration of the application, which, by the terms of the policy, "is made a part" of the policy. And we think that the exception taken to the refusal of the court to charge "that the defendant is not bound by any verbal statement made by James Hamilton to Matthew Smith, which does not appear in the application," presents an error. The foregoing views lead to the conclusion that the verdict ought to be set aside.

Judgment and order reversed, and a new trial ordered, with costs to the appellant to abide the event.

FOLLETT, ADAMS, GREEN, and WARD, JJ., concur in the result on the ground that the verdict is contrary to the evidence.