[No. 3654.]

MODERN WOODMEN OF AMERICA v. THE INTERNATIONAL TRUST COMPANY, GUARDIAN.

1. FRATERNAL SOCIETY—*Knowledge of Falsity of Representations in Application for Membership*. Action upon the insurance clause of a

certificate of membership. It was clearly made to appear that the statements of the member, in his application, as to his habits in the matter of the use of intoxicating liquors, were false. But it appeared that, before accepting the application, one Hume, who it was contended was the representative of the society, had been expressly told that the applicant would not be a desirable member, that "he drank too heavily." Another witness, an intimate friend and associate of the member, had said to Hume, in speaking of the member, some two weeks after the occurrence, that "he would not write him up  *  *  *  that he was too much of a drinker." The plaintiffs contended upon this that the society were fully informed of the falsity of the statements of the applicant, before accepting his application, had accepted membership fee and expenses with such knowledge, and were therefore estopped to deny liability. _Held_ that the statements of the witnesses relied upon were not necessarily conflicting with the statements of the application; that neither of the witnesses gave any idea of the amount or quality of intoxicating liquors consumed by the member, or how frequently indulged; that their expressions were mere hazy opinions, founded on no facts disclosed in the record, and that the society was not under duty to pursue an investigation beyond the medical examination.

2. PRINCIPAL AND AGENT—_Evidence of Agency._ The evidence examined and held insufficient to show that the alleged representative of the society was in fact such representative.

3. —— _Knowledge of Agent—How Far the Principal Is Charged by._ The rule which charges the principal with the knowledge of the agent is for the protection of innocent third persons, and not those who use the agent to effect a fraud upon the principal.

4. CONTRACTS OF INSURANCE—_Construction—Limitations Upon Authority of Soliciting Agent._ When not controlled by statute, contracts of insurance are construed by the same rules of law as other contracts.

An insurance company, when not restricted by statute, may limit the authority of its agents, and an applicant for insurance dealing with an agent whose authority is limited by the express terms of the application cannot benefit by any act of the agent in excess of his authority as so limited.

The applicant for insurance is presumed to read the application which he is required to sign.

_Supreme Lodge v. Davis_, 26 Colo., 252; _Pacific Life Company v. Van Fleet_, 47 Colo., 401; _Sun Fire Office v. Wich_, 6 Colo. App., 113; _Merchants' Company v. Harris_, 51 Colo., 109, examined and distinguished.

5. —— _Insurance Obtained by Fraud—Premiums_, are forfeited.

*Appeal from Denver District Court.* HON. HUBERT L. SHATTUCK, Judge.

Mr. TRUMAN PLANTZ, Mr. TULLY SCOTT and Mr. GEORGE C. PERRIN for appellant.

Mr. S. D. CRUMP and Mr. HENRY C. ALLEN for appellee.

BELL, J.

This case was ably presented in the principal and supplemental briefs originally filed and oral arguments made previous to our opinion heretofore announced; but other points are raised and authorities cited in the petition presented for a rehearing, which is denied, and, for a more orderly disposition of all the questions now herein involved, our original opinion is hereby withdrawn and substituted by the following:

The action was brought by the International Trust Company, appellee herein, as guardian of the minor heirs of Henry Conter, against the Modern Woodmen of America, appellant, a fraternal benefit society organized under the laws of the state of Illinois, and doing business in the state of Colorado under section 73, chapter 70, of the Revised Statutes of 1908. Said society has a lodge system with a ritualistic form of work, a representative form of government, and is self-governing in its administration, and, in the early part of the year 1909, organized a local camp at Globeville, Colo. On the 2nd day of February, 1909, Henry Conter, above named, made application to said society for membership in said Globeville camp, and for a benefit certificate in the sum of $3,000.00, and, in said application, which was in writing, warranted that all statements and answers by him made therein were full, complete and literally true, and especially agreed therein that the literal truth of each answer should be a condition precedent to any binding

contract issued upon the faith of such answers, and agreed that they should become a part of the benefit certificate. In the last paragraph of said application, immediately preceding the signature of the applicant, his attention was especially called to the following notice:

"That inasmuch as only the head officers of the society have authority to determine whether or not a benefit certificate shall issue on any application, and as they act upon the written statements, answers, warranties and agreements herein made, no statements, promises, knowledge or information had, made or given by or to the person soliciting, taking or writing this application, or by or to any person shall be binding on the society, or in any manner affect its rights, unless such statements, promises, knowledge or information be reduced to writing and presented to the head officers of the society at or before the time any benefit certificate shall be issued hereon; and I further agree that if any answer or statement in this application is not literally true, or if I shall fail to comply with or conform to any and all by-laws of the said Modern Woodmen of America, whether now in force or hereafter adopted, that my benefit certificate shall be void."

On the same day, February 2nd, 1909, the applicant appeared before Dr. Van Landingham, the examining physician for the society, and, in answer to the questions contained in his application, purported to state his family history, his health condition, and habits. The answers thus made by him were written by the examining physician in the application, which was subsequently signed by the applicant, and represented, in substance, that he had not, in the last seven years previous to the date of his application, been treated by or consulted any person, physician or physicians in regard to personal ailments; that he never had any local disease, personal injury, or serious illness; that, at the time of the examination, he

was of sound body, mind and health, free from disease or injury, and of good moral character and exemplary habits; that he did not use intoxicating liquors daily; that he had never been intoxicated; and that the kind and quantity of intoxicating liquors consumed by him was "an occasional beer." On the 19th day of March, 1909, the appellant issued a benefit certificate to the applicant, on said application and the answers contained therein, and on April 11th, 1909, twenty-three days after issuing the same, the assured died from fatty degeneration of the heart. The appellee, as guardian of the minor children of the assured, sought to collect from the appellant the sum of $3,000.00 as provided in the benefit certificate, and brought suit in the district court of the city and county of Denver for the amount. The appellant resists payment of this certificate because, it avers, the assured made false statements in his application in regard to his health and habits, and that at the time he made such statements he had a disease of the heart, and was intemperate in the use of intoxicating liquors, which was the indirect cause of his death, and that such false statements and intemperance on the part of the assured, under the terms of his application and the by-laws of the society, render his certificate null and void. The appellee denies the above charges, and alleges that, if they are true, the agents and officers of the appellant society knew the actual condition of affairs at and before the time of issuing the certificate, and accepted from the assured his dues, premiums and fees with full knowledge of these conditions, and has, therefore, waived the conditions in this respect in the application, its by-laws and the certificate, and is estopped from asserting a forfeiture.

On the 12th day of April, 1909, Doctors Carlin and Bennett held an autopsy on the body of the assured, and were able to, and did, determine that the assured died from fatty degeneration of the heart; but were unable

to determine, from their examination of the body, the primary cause of the disease. Dr. Carlin testified that fatty degeneration of the heart is an affection which "causes the muscular fibres of the heart to change into fat surface and become friable and soft" so that the finger might be pushed through with very little effort, while the ordinary heart is tough, and that, in the case of the assured, the disease was in an advanced stage, and the heart reduced in size. He further testified that the primary cause of the disease is any wasting disease of the body, such as cancer, tuberculosis, alcoholism, and long sieges of typhoid fever, diphtheria, arsenical and phosphorous poisoning, and Dr. Bennett adds to these torpidity of liver, poor circulation, bad digestion, and other things which tend to upset the heart. The witness Miller, a druggist, testified that he thought the assured was suffering from heart trouble for some time before the date of his application, because of his bad complexion and complaints of dizziness, and had sold him strychnine tablets to relieve him of this trouble, but did not advise the assured that they were for this purpose. Another witness, Jennie Sardakovski, who was well acquainted with the assured and had business transactions with him, testified that about a year before his death, and again about two weeks previous thereto, she saw him taking tablets which, he told her, were for his heart. Dr. Lee testified that he examined the assured for a policy in the Prudential Insurance Company about thirty days previous to his death, or seven days before the certificate in question was issued, and found his heart action to be very rapid. Counsel for appellant endeavored to have the witness state the cause assigned to him by the assured for this abnormal condition, but, upon objection of the appellee, the court refused to hear the testimony.

It also developed at the trial that for the last four and one-half years of the assured's life he habitually in-

dulged in the use of intoxicating liquors, using both beer and whiskey. Charles Newman testified that he knew the assured personally for a period of five years before his death; that they lived within three blocks of each other, and for weeks at a time he would see him daily, and at times he would not see him for a week or two; that whenever they met the assured took a drink of beer, and sometimes two, three or a whole lot more; that they both drank about the same, and would send for a can of beer and drink together; that it was a daily occurrence for the assured to drink beer when they were together, and, at times, but not frequently, the witness saw him under the influence of intoxicating liquors; that they both got drunk together, but not often; and that he, the witness, solicited applications for membership in the Globeville camp, but refused to take the assured's application, because he was too much of a drinker, to his knowledge, for fraternalism. Michael Pishko testified that he worked for the assured for more than four years immediately prior to his death; that he drove the wagon in the mornings and cut meat in the afternoons; and that, during this time, he drank whiskey and beer with the assured. His examination, in part, is as follows:

"Q. Did his habit of taking drinks extend over the whole period of four years that you knew him? A. Yes, sir.

"Q. Did he become intoxicated or under the influence of liquor? A. Under the influence? Yes, sir.

"Q. Did it (Conter's drinking) cover this period generally, every day or every week? A. Yes, sir; I suppose he took his drink every day."

Pishko also testified that he saw the assured drink beer the day he died. Jennie Sardakovski testified that the assured occupied the ground floor of her building and slept in a bunk behind the ice-chest, at least part of the time, for three years immediately prior to his death;

that she saw him nearly every day; that she saw him drinking whiskey and beer in the store; and that the year before he died he drank heavily some days, and some days he did not.   C. M. Higdon testified that he was a Denver policeman on the beat where the assured did business and saw him almost daily for a period of four and a half years before his death; that the assured had the reputation of being, and was, a very heavy drinker, and was frequently intoxicated during this time; that he, the witness, was called upon to arrest the assured three different times for intoxication and disturbance; and that such periods of intoxication occurred during the entire four and a half years that the witness knew the assured; that the assured, during the last six or eight months of his life, kept a jug of whiskey and a case of beer in his place of business and served it to his customers and drank with them; that he was a customer of the assured and drank with him several times, and at such times the assured drank more than he did, he generally taking but one drink while the assured took two or three; and that the assured was exceedingly liberal in treating his friends and customers.

The foregoing statement of the testimony convinces this court that no safe or conservative insurance company or society would have accepted this risk with knowledge of the excessive drink habits of the assured, as above detailed.   In fact, appellee's counsel made no special effort to refute the evidence of the dissipated practices of the assured, but rather defended on the ground that the appellant society received the application, initiation charges and legal fees of the assured, and accepted him, with full knowledge of his intemperate habits, and is therefore estopped from benefiting by his false answers.   The majority of this court takes a different view of the evidence from that presented by appellee's counsel.   Dr. Van Landingham, examining physician for appellant, testi-

fied that he had seen, but thought he had no acquaintance with, the assured at the time of the examination; that he read the questions from the application, and the assured answered yes or no, whatever was required, and he wrote the answers as they were given. There is no pretense that the answers were not written as the assured gave them. It is shown by Dr. Van Landingham that he was employed by the appellant society, through Mr. Hume, to make the medical examinations, but there is no evidence that he knew anything whatever about applicant's drink habits. It is claimed, however, that Miller and Newman notified Hume of these habits. The testimony of Miller is that he "met him (Hume) when he first came out there to organize a lodge of Woodmen. * * * I think I was one of the first men that was consulted by Mr. Hume as a prospective member. * * * I told Mr. Hume that Henry Conter was not a desirable member for the organization. * * * That he drank too heavily, and I thought his heart was in bad condition."

"Q. On what did you base your information that you gave Mr. Hume, as to his being a heavy drinker? A. Personal observation, I guess.

"Q. You knew that to be a fact? A. I knew that he drank more than I would want to drink.

"Q. Well, in your opinion, he drank so much that you suggested that he was not a fit person, because, as one of the reasons, that he was a heavy drinker? A. Yes, sir."

The witness Newman testified as follows:

"I came in there (Conter's store) to write a party up, and I wrote him up, and he came up and started to ball me up about insurance, and I said 'You need not talk about it. I would not have you in the Modern Woodmen or any other lodge.'

"Q. I mean between you and Mr. Hume. A. Well, that happened about two weeks afterwards. I told him I

would not write him up, for I was—he was telling me that he is paralyzed.

"Q.   What reason did you give for not writing him up?   A. That he was too much of a drinker, to my knowledge, for fraternalism."

It is difficult for us to see how the statement made by Newman could have made any substantial impression upon Hume as to assured's drink habits.   Newman seems to have been a bosom companion of the assured, and stated in his testimony that they were frequently associating and drinking together, and got drunk together, but not often, and that they both drank about the same. If the witness considered the assured too much of a drinker for fraternalism, we are unable to see how he could have regarded himself as a fit member for fraternalism.   From the relations existing between Newman and the assured, the remark made in reply to the assured's "balling up" the witness would appear very inconsistent and unnatural, unless made in a mere spirit of pleasantry between two intimate friends.

After creditable efforts were exerted by counsel for appellee to obtain some fact that was put into the possession of Hume showing the intemperate habits of the assured, they dismally failed.   Conter was sent to the examining physician and told him, in substance, that his habits were exemplary; that he never had been intoxicated; that he did not use intoxicating liquors daily, and that the kind and quantity of intoxicating liquors consumed by him was an occasional beer.   The statement made by Miller to Hume that the assured drank too heavily, and the statement of Newman to Hume that the assured "was too much of a drinker, to (his) knowledge, for fraternalism" were vague opinions of the witnesses which did not necessarily conflict with the statements of the assured in his medical examination.   Either of the witnesses, for aught we know, may have thought that

."an occasional beer" was drinking too heavily, or New-man may have thought "an occasional beer" made the assured "too much of a drinker for fraternalism." Neither of the answers of these witnesses gave Hume any idea of the amount or quality of intoxicating liquors consumed by the assured or the frequency of his indulgences. They were mere hazy opinions bottomed on no facts disclosed in the record at least, and, in our opinion, under the condition of the record, no rule of ordinary diligence required the appellant to pursue its investigation beyond the medical examination. It will also be observed that the opinion of Newman was not expressed to Hume until two weeks after the assured "balled up" the witness for insurance, and there is neither evidence nor presumption that the physician's examination and the acceptance of the application were not then completed. There is a great dearth of evidence as to the position of the agent Hume. At the trial, counsel for appellee requested that counsel for appellant admit that Hume "was an assistant of the deputy head consul." Counsel for appellant replied: "He was assistant deputy of the head consul with the limited power, only, to solicit members." Counsel for appellee then said: "We want to offer especially out of the by-laws of the defendant chapter 27, consisting of sections 210 to 222, inclusive," which were admitted, showing the authority possessed by head and deputy head consuls, but make no reference to the authority of an assistant of such deputies. They gave deputy head consul authority to solicit members and organize local camps when and wherever the head consul might direct, and permitted him to collect and retain the membership fee of not less than $5.00 for his services, and to solicit members for organized camps, when short of members, on the same terms. Counsel for appellee, in argument, speak of the organization of the Globeville camp by Hume; however, the evidence

does not bear this out. The record shows that Hume secured Dr. Van Landingham as examining physician for the camp, consulted with Miller when he first arrived about the organization of said Camp, solicited and obtained the applications of Miller and the assured, and this is about the extent of his participation in the business of the organization found in this record. There seemed to be a contention of counsel as to whether he really organized the camp. Counsel for appellee intimated that he did, while counsel for appellant insisted that he did not, and each of the parties tried to establish its contention by the evidence of A. W. Miller, who was elected clerk of the local camp at the time of its organization. Appellee's counsel asked the witness:

"Q. You do know, however, that he was the man who organized the local camp * * * ? A. He is the man who took my application."

Counsel for appellant later asked:

"Q. Mr. Miller, as a matter of fact, Mr. Hume did not organize the camp, did he? A. I do not believe that I said he did, did I?"

There is no adequate proof that the agent Hume organized the local camp or had any authority to do more than select the examining physician, solicit applications and forward them to the head officers of the society; and, if we are to be governed by Miller's testimony, we should conclude that he did not organize the local camp.

With this condition of the record before us, it is insisted that the society had knowledge, through its agents Miller and Hume, of the impaired health and intemperate habits of the assured, and, therefore, the law of waiver and estoppel operates in favor of the appellee. We are not prepared to admit the knowledge of the society as contended, but, even though it had been shown to our satisfaction that Miller and Hume had this knowledge, the appellee, under the authorities and in view of the wilful

misrepresentations of the assured, could not benefit by the fact, for it is said in 2 Bacon on Ben. Soc. & L. Ins., 3rd ed., sec. 434-a, that:

"It is an elemental rule that where the means of knowledge are equal there can be no estoppel, nor can estoppel exist without some act of the party estopped misleading the other to his disadvantage."

In *Ketcham v. The Am. Mut. Acc. Assn.*, 117 Mich., 521, 76 N. W., 5-6, the supreme court of Michigan said:

"The courts have always been anxious to take care of the rights of the assured when the applicant had relied upon the agent informing the company what had been truthfully told to him about the character of the risk; but the courts never have said the company is bound by statements contained in an application, when not only the agent, but the assured knows they are untrue, and calculated to deceive, and the application is to be forwarded to the company as the basis of its action. To so hold would put these organizations completely at the mercy of dishonest and unscrupulous agents."

See, also, *Ins. Co. v. Fletcher*, 117 U. S., 519, 6 Sup. Ct., 837, 29 L. Ed., 934; *M. W. of A. v. Owens*, 130 S. W. (Tex.), 860; *Hexom v. Maccabees*, 140 Iowa, 41, 117 N. W., 19; *Kempe v. W. O. W.* (Tex. Civ. App.), 44 S. W., 688, 14 L. R. A. (N. S.), 280, note; *Bonewell v. N. Am. Co.*, 160 Mich., 137, 125 N. W., 61; *S. C.* on rehearing, 167 Mich., 274, 132 N. W., 1067, Ann. Cas., 1913A, 847; *Loftin v. Benev. Assn.*, 9 Ga. App., 121, 70 S. E., 353; *Mudge v. I. O. F.*, 149 Mich., 467, 112 N. W., 1130, 14 L. R. A. (N. S.), 279, 119 Am. St. Rep., 686; *Collins v. Co.*, 32 Mont., 329, 80 Pac., 609, 1092, 108 Am. St. Rep., 578; *Wilhelm v. Columbian Knights*, 149 Wis., 585, 136 N. W., 160; *McGreevy v. Nat. Union*, 152 Ill. App., 62; *Dimick v. Co.*, 69 N. J. Law, 384, 55 Atl., 291, 62 L. R. A., 774; *Maier v. Co.*, 78 Fed., 566, 24 C. C. A., 239; *Mattson v. Samaritans*, 91 Minn., 434, 98 N. W., 330.

It is intimated by counsel for appellee that Hume was influenced in soliciting the membership of the assured by reason of the fee attached, and from this they argue that if the society is thus dominated by a desire on the part of its officers for fees and salaries, the members of the society should pay such claims as the one here presented.

It is said by the supreme court of Washington in *Elliott v. Knights of the Modern Maccabees,* 46 Wash., 320, 89 Pac., 929-930, 15 L. R. A. (N. S.), 856, that, if a person colludes with an agent to cheat the principal, the latter is not responsible for the act or knowledge of the agent, for the rule which charges the principal with what the agent knows is for the protection of innocent third persons, and not those who use the agent to further their own fraud upon the principal. It is there held that, while notice to an agent is notice to his principal as a general rule, an exception to this rule arises when the agent's conduct is such as to raise a clear presumption that he will not communicate to his principal his knowledge of the fact in controversy, and where he acts in his own interests and adversely to those of his principal. In the case there under consideration the age limit for membership was fifty years, and Elliott informed the deputy commander that he was fifty-five years of age. The deputy asked him to state his age as of fifty years, and promised to secure his admission. The suggestion was acted upon, Elliott was admitted and remained a member of the tent until he had paid in dues the sum of $348.00 and was entitled to certain returns under the rules. It was then discovered that he had misrepresented his age, the society canceled his membership; he sued to recover the above stated amount, and the court held that he and the agent were working for their own interests, and neither of them for the interests of the society, and denied his right to a return of the dues paid by him. See also *Ryan*

*v. World Mut. L. I. Co.,* 41 Conn., 168, 19 Am. Rep., 490; *Hanf v. N. W. Masonic Aid Assn.,* 76 Wis., 455, 45 N. W., 315; 1 Enc. of Law, 2nd ed., 1144-1145.

However, we have found that there is no substantial evidence showing that the agent Hume had knowledge of the falsity of the statements. But, if we should concede his knowledge, it could not excuse the culpability of the assured, and the trial court should have granted the request of appellant for an instruction to the jury that it return a verdict for the defendant.

The foregoing conclusion is sufficient to dispose of this case, and we feel that it is unnecessary for us to go beyond this; but the case has been so ably and exhaustively argued on both sides, and so many authorities have been produced *pro* and *con,* and such persistent demands have been made in counsel's argument for a rehearing, that we feel constrained to present some of the points urged and authorities cited in support thereof, if for no other purpose than that the bench and bar may have the benefit of the researches of counsel.

It will be seen from a quotation from the application of the assured in the early part of this opinion that a policy should issue only upon the written statements, answers, warranties and agreements made in the application, and that no statements, promises, knowledge or information had, made or given by or to the person soliciting, taking or writing the application should be binding upon the society or in any manner affect its rights, unless such statements, promises, knowledge or information were reduced to writing and presented to the head officers of the society at or before the time any benefit certificate should be issued thereon, and that the certificate should be void if any of the statements contained in the application, which were made warranties *in toto,* should not be wholly true. This notice of the limited character of the soliciting or other agents of the com-

pany appeared in large type in the application immediately above where the assured signed the same, with a headline printed in large capital letters as follows: "APPLICANT WILL PLEASE NOTE THIS CLAUSE," thereby using every endeavor on the part of the society to bring the limited authority of the agents to the notice of the assured. Prior to March 29th, 1886, when the supreme court of the United States announced its opinion in the case of *New York Life Ins. Co. v. Fletcher*, 117 U. S., 519-536, 29 L. Ed., 934, 6 S. C. Rep., 837, on an application similar to the one under consideration, the courts showed a tendency to hold that the knowledge of the agent was the knowledge of the company, regardless of the attempts of companies to limit the authority of agents; and, with many courts, there seemed to be no discrimination made between the decisions cited from courts of states where the legislatures had specially provided that "persons soliciting insurance or procuring applications therefor should be held to be the agents of the insurance companies, anything in the application or policy to the contrary notwithstanding," as in the state of Iowa, Laws of 1880, Chap. 211, p. 209, and those where the general principles of agency only, without any statutory restrictions, were involved.

Justice Field, in writing the opinion in the Fletcher case, *supra*, disregarded all authorities where the agent's authority was not limited, and said that in cases where the agents were not limited in their authority they would be deemed as acting for the companies, but where the power of the agent was limited, and notice of such limitation given to the applicant in the application, which he was required to make and sign and which he must be presumed to have read, he would be bound by such limitation, and that there was nothing in insurance contracts which distinguished them in this particular from others. He further said that, if the assured had read even the

printed lines of his application, he would have seen that it stipulated that the rights of the company could in no respect be affected by the agent's verbal statements, unless reduced to writing and forwarded with the application to the home office; that the company, like any other principal, could limit the authority of its agents and thus bind all parties dealing with them with knowledge of such limitation; and that it must be presumed that the applicant read the application and was cognizant of the limitation therein expressed, when the notice was so clearly brought to his attention.

In *Iverson v. Met. Life Ins. Co.*, 151 Cal., 746, 91 Pac., 609-612, 13 L. R. A. (N. S.), 806, the supreme court of California had the same question under consideration, and held that, when a soliciting agent takes an insurance application in which it is stipulated that the answers of the applicant are true and are the basis of the contract of insurance; that, if untrue, the policy should be void; that only officers of the insurer had authority to determine whether a policy should issue; and that no statement made to the soliciting agent should be binding on the insurer, unless reduced to writing and presented to the officers of the company at the home office, the company would not be held liable on the policy issued on such application, unless informed as provided therein. In that case the agent of the company solicited an application from Iverson, whom he had known for over two years, and knew that he had suffered a stroke of paralysis, but this information was not communicated to the general agent of the company; the assured stated in his application that he never had paralysis, and the court declared the policy void, and held that, under the conditions of the application, the knowledge of the soliciting agent was not the knowledge of the company. It further held that an insurance company, like any other principal, could prescribe limitations upon the power and authority

of its agents, and persons dealing with such agents, with notice of the limitations upon their authority, are bound by the restrictions imposed; and that in the case before it the assured was plainly informed in the application that only the officers at the home office had authority to determine whether a policy should issue on the application, and that they acted on the written statements, answers, warranties and agreements contained therein in determining the matter.

In *Dimick v. Met. Life Ins. Co.*, 69 N. J. L., 384, 55 Atl., 291, 62 L. R. A., 779-780, involving the same questions of limitations of agencies as were considered in the Fletcher and Iverson cases, the court said the company certainly was at liberty to limit the powers and authority of its own agents, and third parties dealing with such agents, with express notice of the limitations thus imposed, could not bind the principal by any act done by the agents in excess of the bounds of their authority; that, if a similar question were raised concerning a contract relating to any other subject matter, not the slightest doubt would be entertained with respect to the binding force of the limitation; and, if persons seeking insurance, and insurance companies, are to be left free to enter into such contracts as they please with reference to life insurance, it is difficult to find any ground on which to ignore the force of these express stipulations, and, if there is any public policy requiring a rule different from that applicable to other subjects, it is for the legislatures, and not for the courts, to declare it.

See also, to the same effect: *Northern Assur. Co. v. Grand View Bldg. Assn.*, 183 U. S., 308, 22 Sup. Ct., 133, 46 L. Ed., 213; *McCoy v. Met. Life Ins. Co.*, 133 Mass., 82; *Clemens v. Sup. Assembly*, 131 N. Y., 485, 30 N. E., 496, 16 L. R. A., 33; *Rinker v. Aetna Life Ins. Co.*, 214 Pa., 608, 64 Atl., 82-84, 112 Am. St. Rep., 773; *Cleaver v. Ins. Co.*, 65 Mich., 527, 32 N. W., 660, 8 Am. St. Rep., 908;

*Cook v. Standard L. & Acc. Ins. Co.,* 84 Mich., 12, 47 N. W., 568-571; *Ketcham v. Am. Mut. Acc. Assn.,* 117 Mich., 521, 76 N. W., 5, 6; *Modern Woodmen of Am. v. Tevis,* 117 Fed., 369-378, 54 C. C. A., 293; *National Union v. Arnhoist,* 74 Ill. App., 482-489; *Elliott v. Knights of the Modern Maccabees,* 46 Wash., 320, 89 Pac., 929-930, 13 L. R. A. (N. S.), 856; *Sun Fire Office v. Wich,* 6 Colo. App., 103-113, 39 Pac., 587.

Counsel for appellee, in their petition for a rehearing, contend that our supreme court, in the case of *Supreme Lodge K. of H. v. Davis,* 26 Colo., 252-259, 58 Pac., 595, decided the question of agency contrary to the conclusions which we here hold. We have re-examined the Davis case and are satisfied that the facts therein considered involved the ratification of the acts of an agent. The facts before us involve the power of an insurance company to limit the authority of its agents and bind the assured by bringing notice of such limitation to him in the application which he is required to sign. We have also carefully examined the cases of *McGurk v. Met. L. Ins. Co.,* 56 Conn., 528, 16 Atl., 263, 1 L. R. A., 563; *Coolidge v. Life Ins. Co.,* 1 Mo. App., 109, and 1 Bacon Ben. Soc. & Life Ins., sec. 160, authorities relied upon by our supreme court in the Davis case, all of which recognize the general rule that notice to the local agent of an insurance company, in making application for insurance, is notice to the company. The force of this general rule is not denied, and is not before us for consideration; but the question here presented is, as before stated, whether an insurance company can create an exception to the general rule by limiting the authority of its agents and giving notice of such limitation to the applicant in the application, which is part of his contract and which he is required to make and sign, as was done in that part of the application before us heretofore recited. Our supreme court, in the Davis case, made no pretense of con-

sidering such a question, nor are the authorities relied upon by it applicable to the facts before us. In the case of *Ryan v. The World L. Ins. Co.*, 41 Conn., 168-173, 19 Am. Rep., 490, cited with approval in the *Fletcher* case, *supra,* the supreme court of errors of Connecticut passed upon facts similar to those we are now considering, and held that such a limitation and notice was binding on the assured, and, in the case of *Ward v. Met. L. Ins. Co.*, 66 Conn., 227-240, 33 Atl., 902, 50 Am. St., 80, the same court distinguished the *McGurk* case, cited by our supreme court as an authority in the *Davis* case, and again recognized the exception which is here presented. 1 Bacon, sec. 160, relied upon by our supreme court, merely states the general rule, but, in a foot-note thereto, also recognizes the exception as follows:

"But when the policy limits the authority of the agent, there is no presumption that such agent communicated his knowledge to the company."

Further, when the *Davis* case was being considered, the case of *Sun Fire Office v. Wich,* 6 Colo. App., 113, 39 Pac., 587, and also the *Fletcher* case, *supra,* had been decided, both recognizing the right of the insurer to limit the authority of its agents and bind the assured by giving notice of such limitation in the application which was made a part of the contract or policy, and no reference whatever was made to either of these authorities by our supreme court in the *Davis* case. From the painstaking industry and learning of the justice of our supreme court who wrote the opinion in the *Davis* case, it cannot be presumed that he overlooked or ignored the settled doctrine supported by the *Ryan* and *Ward* cases, the footnote to sec. 160 of 1 Bacon, the opinion of our own court of appeals in the *Wich* case, or that of the United States supreme court in the *Fletcher* case.

But it is contended by appellee that our supreme court, in the case of *Pacific Life Co. v. Van Fleet,* 47

Colo., 401, 107 Pac., 1087, repudiated the doctrine of the *Fletcher* case and that we err in considering it as an authority here. A mere glance at the *Van Fleet* case will convince anyone that the facts there are essentially different from those in the case at bar, and that our supreme court distinguished the facts in that case from those in the *Wich* and *Fletcher* cases rather than repudiated the legal principles declared in the latter cases. The court expressed itself as follows:

"The *Fletcher* case is cited with approval by our court of appeals in the *Wich* case. The facts of these cases may be, in one or two important particulars, distinguished from the facts of the case at bar. But whatever may be said of their doctrine, we do not think they are controlling under the facts of this case, and we cannot apply their doctrine."

In the *Van Fleet* case the soliciting agent of the company, who had power to solicit, prepare and transmit applications for insurance, filled in the blank spaces in the application and inserted therein answers which he knew to be false. The court said:

"It would seem that decisions of the supreme court of the United States of a later date than the *Fletcher* case, and certainly our own decisions, make the soliciting agent the representative of the insurer *when he makes out the application himself,* and his knowledge the knowledge of the defendant, and estop the company to declare the policy void *because of the mistake or fraud of its agent.*"

In the case at bar the soliciting agent, Hume, did not insert in the application the answers complained of. The false answers therein were made by the assured himself to the examining physician and written, as given, in the application by the examining physician, who was a stranger to the assured, and knew nothing whatever of his habits or the falsity of his answers. In this respect,

particularly, the *Van Fleet* case differs materially from the case at bar, and is in no way applicable to the facts before us.

It would seem that the learned justice who wrote the opinion in the *Van Fleet* case had some doubts as to the attitude of the United States courts toward the doctrines announced in the *Fletcher* case. However, the subsequent decisions of the United States courts have followed and applied these doctrines and very generally distinguished the *Chamberlain, Wilkinson* and *Fletcher* cases, as is shown in *Northern Assur. Co. v. Grand View Building Assn.,* 183 U. S., 308-358, 22 Sup. Ct., 133, 46 L. Ed., 213, wherein the *Fletcher* case is expressly approved, largely quoted from and followed; *Sawyer v. Equitable Co.* (C. C.), 42 Fed., 30; *Mutual Co. v. Robison* (C. C.), 54 Fed., 580-595; *Standard L. & Acc. Co. v. Fraser,* 76 Fed., 705, 22 C. C. A., 499; *Maier v. Fid. & Mut. L. Assn.,* 78 Fed., 566, 24 C. C. A., 239; *Hubbard v. Mut. Reserve* (C. C.), 80 Fed., 681; *Glover v. Nat. Fire Ins. Co.,* 85 Fed., 125, 30 C. C. A., 95; *Brown v. Casualty Co.* (C. C.), 88 Fed., 38-41; *U. S. Life Ins. Co. v. Smith,* 92 Fed., 503-507, 34 C. C. A., 506; *Caruthers v. Kansas Mut. L. Ins. Co.* (C. C.), 108 Fed., 487-494; *John Hancock L. Ins. Co. v. Houpt* (C. C.), 113 Fed., 572-576; *Modern Woodmen v. Tevis,* 117 Fed., 369, 54 C. C. A., 293, and *Phoenix Ins. Co. v. Warttemberg,* 79 Fed., 245-248, 24 C. C. A., 547.

In the *Warttemberg* case, *supra,* the circuit court of appeals clearly announced that the decision of the court in the case of *Insurance Co. v. Chamberlain,* 132 U. S., 304, 33 L. Ed., 341, 10 S. C. Rep., 87, did not attempt to modify the doctrine of the *Fletcher* case, and said that it was based expressly upon the statute of Iowa, in which state the contract of insurance had been made, providing that "any person who shall hereafter solicit insurance or procure applications therefor shall be held to be the soliciting agent of the company or association issuing the

policy on such application or on a renewal thereof, anything in the application or policy to the contrary notwithstanding.''

The court further said:

''We find no other decision of the supreme court subsequent to the *Fletcher* case which in any way modifies that case.''

It is rather surprising that anyone who read the *Chamberlain* case should have thought that such was intended, in anywise, to modify the *Fletcher* case. Justice Harlan, who wrote the opinion in the *Chamberlain* case, expressly stated that counsel upon one side insisted that the *Fletcher* case controlled, and counsel upon the other side insisted that other decisions of the United States supreme court controlled, and he held that the statute of Iowa controlled, and based the decision thereon, and anything he said in the previous part of the opinion about general rules is *obiter dictum* and not authority upon any question.

Justice Campbell, in the *Van Fleet* case, made no pretense of overruling the doctrine laid down in the *Fletcher* case, adopted by our court of appeals with approval in the *Wich* case, to the effect that it is competent for any party, corporation or individual, employing an agent in the negotiation of a contract, whether of insurance or otherwise, to limit his power, provided the limitation is brought home to the knowledge of the other contracting party, and, that in an insurance application, which the assured is required to sign, such notice may be brought to the attention of the assured therein.

In *Merchants Ins. Co. v. Harris,* 51 Colo., 109, 116 Pac., 143, our supreme court said ''insurers should undoubtedly be allowed to protect themselves, in any legal way possible, against the fraud of their unfaithful agents, but not at the expense of innocent third parties. And when a loss caused by a dishonest agent must fall upon

his principal or a third party, both equally innocent, the courts should not, and do not, ordinarily, hesitate in putting the burden upon the person who selected and controlled the agent.''

It would seem from the foregoing stated conditions that neither the facts nor decisions in the *Van Fleet* or *Harris* cases affect those parts of the *Wich* or *Fletcher* case which apply to the facts of the case at bar, if it was the intention of our court to repudiate anything decided in either of these cases, and we, therefore, regard them as authority herein.

We may say here that the authorities herein cited and examined by us support the following principles:

First, contracts of insurance are to be considered and construed, when not controlled by statute, by the same rules of law and interpretation as other contracts in order to carry out the intention of the parties.—*Merchants Ins. Co. v. Harris, supra,* 108.

Second, under the general principles of the law of agency, an insurance company, when not restricted by statute, is at liberty to limit the authority of its own agents, and an applicant dealing with an agent whose authority is so limited by the express terms of the application, which the applicant is presumed to read and required to sign, cannot benefit by any act done by such agent in excess of his authority so limited and declared. —*Dimick v. Met. L. Ins. Co.,* 69 N. J. L., 384, 55 Atl., 291, 62 L. R. A., 781-782; *Sun Fire Office v. Wich, supra,* 113-114, and other cases heretofore cited.

Third, if the people of any state wish to change the public policy thereof in insurance matters, by limiting the general rule of agency, it is for the legislatures, and not for the courts, to so change it.—*Dimick* and *Wich* cases, *supra.*

Counsel for appellee, in their petition and brief for a rehearing, also complain, because, they say, that the

authorities overwhelmingly show, in a case like this, that the company must plead and tender a return of the dues and assessments paid. We did not go into this question exhaustively, as it was not raised in the court below, nor in this court until after the case had been orally argued; and, under such conditions, unless it is necessary to prevent injustice from prevailing, the courts are not inclined to consider any questions which are so untimely presented. However, in our opinion heretofore announced, we did cite the case of *Elliott v. Knights of the Modern Maccabees*, 46 Wash., 320, 89 Pac., 929-930, 13 L. R. A. (N. S.), 856, wherein the assured defrauded the society, by collusion with the agent, in obtaining a policy, and paid $348 in dues and assessments before the society discovered the fraud and canceled his policy or certificate. Upon action brought by him to recover the dues and assessments so paid, the supreme court of Washington held that, where the policy was obtained by fraud on the part of the applicant, or by collusion between the applicant and the agent, he forfeited all payments. In *Nat. M. F. Ins. Co. v. Duncan*, 44 Colo., 472-480, 98 Pac., 634, 20 L. R. A. (N. S.), 340, our own supreme court settled the question in this jurisdiction in the following language:

"Counsel for plaintiff also contends that the defense under consideration is insufficient because it does not allege that the company has repaid the premium or any part thereof to the insured. The company is not seeking to rescind its contract of insurance, but to avoid liability thereon because of the fraud of the insured. Where a policy by its terms is void by reason of fraud on the part of the insured, the premium cannot be recovered back."

See also *Aetna L. I. Co. v. Hall*, 10 Ill. App., 431; *Freismuth v. Agawan M. F. I. Co.*, 64 Mass., 588; 2 May on Ins. (4th ed.), sec. 567.

The general rule is stated in a footnote to *Taylor v.*

*Grand Lodge A. O. U. W.,* 96 Minn., 441, 105 N. W., 408, 3 L. R. A. (N. S.), 114, as follows:

"The general doctrine laid down by the text-book writers is that an unintentional breach of warranty on the part of the insured does not authorize a retention of the amount paid as assessments, if no risk has been run by the insurer; but actual fraud in the inception of the contract on the part of the insured forfeits his claim to a return of assessments notwithstanding the fact that no risk has ever attached. See 2 Cooley, Briefs on Insurance, pp. 1037-1048; Niblack, Accident Ins. & Ben. Soc., sec. 282; Vance, Ins., secs. 85, 86; Joyce, Ins., sec. 1406; Cooke, Life Ins., p. 193; 2 May, Ins., 3rd ed., sec. 567."

In the case under consideration we have found that the policy or certificate was obtained by wilful misrepresentations on the part of the assured as to his intemperate habits, hence no such tender or pleading as is insisted upon by the appellee was required. Furthermore, we can find no direct evidence in the record as to the payment of any specific amount by the assured, but there are acknowledgments of the payment of whatever amounts that were necessary to admit the assured as a member, and, by consulting sec. 214 of the by-laws, we learn that the payment of a membership fee of at least $5.00, together with the camp and head physician's fees, was required, and from this it is self-evident that the assured had invested but a very small amount for the certificate in question; and we feel, in view of the condition of the record before us, that we would be doing a great injustice to require the members of the appellant society to pay the judgment of $3,190 rendered in the district court on a certificate that was evidently obtained by wilful concealment of material facts, and which could not have been secured if a truthful statement of the intemperate habits of the assured had been made, or if the society had known of the impaired health of the assured at the time the

certificate in question was issued, and when he accepted said certificate, April 5th, 1909, twenty-three days before his death, upon an express warranty over his own signature to the effect that he was then in good health and agreed that the same should not be binding on the society unless he was then in good health.

We think, upon the evidence, which was practically undisputed, that it was the duty of the trial court to give the instruction requested by the appellant directing the jury to return a verdict in its favor; hence, the judgment is reversed, the case remanded, and the district court directed to enter judgment for costs in favor of the appellant and dismiss the case.

*Reversed and Remanded, With Directions.*

HURLBUT and MORGAN, JJ., dissenting.

---

HURLBUT, J., dissenting:

If I properly understand the majority opinion, it reverses the judgment of the trial court principally upon the ground that the insured, Henry Conter, made false answers to questions propounded to him in his application for the certificate; that the record conclusively showed such answers to be false; and that, such being the case, the warranties and statements incorporated in Conter's application, as well as in the certificate itself, concerning answers made in the application, conclusively bar the beneficiaries from recovery in this action. It further appears in the opinion that the question of waiver on the part of defendant company received but passing notice, though such issue was pleaded and earnestly maintained by plaintiff throughout the controversy. I am of the impression that such waiver is the controlling and dominating issue in this case, and that every other point raised by the record is subservient to it. I think it cannot be gainsaid that issues similar to those determined by the court in the majority opinion have been presented

to the appellate courts throughout the country probably as often as any other kind or class of issues known to the law. Their determination has germinated a multitude of adjudicated cases throughout the various jurisdictions, and the same are in hopeless conflict upon the question of waiver and liability of insurance companies under policies and beneficiary certificates such as here considered. There can be no question but that the majority opinion is supported by numerous authorities of enviable repute, while, on the other hand, authorities of equal standing have construed the same kind of contracts as in the case at bar, and reached conclusions and rendered opinions in direct opposition to those here announced. The majority opinion and those authorities cited in support thereof appear to adopt an unvarying rule that in this class of cases every line, word and syllable, found in the policy or certificate, must be strictly construed and rigidly enforced in favor of the company, taking but scant notice of defenses of waiver generally pleaded and urged by the beneficiaries; while, on the other hand, those authorities which militate against the class just mentioned appear to grasp upon anything found in the record pertaining to the securing and issuing of the policy which would justify a ruling that the company had waived its right to insist upon the strict letter of the contract as against the beneficiaries, and thus prevent a forfeiture of the policy. I do not want to be understood, by the language used, as intimating that this court, or others entertaining the same views on a contract of this character, is actuated by any prejudice for or against insurance companies, their policy-holders, or beneficiaries thereunder. It is to be regretted that all life insurance policies and certificates of beneficiary companies are not short, and couched in brief and simple language, so that policy-holders or members could be justified in the belief (which they usually entertain) that their wives or chil-

dren, upon their death, would be the possessors of certificates of indebtedness equal in financial integrity to government bonds. In my judgment, it would challenge the ingenuity of the greatest living lawyer to draft an application or certificate containing more subtle, unreasonable and inequitable warranties, provisions and restrictions, against the insured, than those found in the printed application and certificate in the instant case. It is a safe suggestion, in view of the majority opinion, that but a small percentage of the million or more members of the appellant company have a clear conception of the uncertain protection afforded their wives and children under issued policies and certificates like those here considered. If there is anything in this criticism, it might be nullified if those courts holding the insured to the strict letter of the contract would require the insurance company, where the policy is being contested, to show that the attention of the insured, prior to the signing of the application and issuing of the policy, had been specifically called to the harsh and unreasonable provisions and restrictions against him contained therein. Many courts adopt this rule in contracts of passengers and shippers with common carriers, and its enforcement has resulted in great benefit to the public at large.

I am willing to admit that, while Conter stated in his application that he had never been intoxicated, and that he used intoxicants only to the extent of "an occasional beer," the undisputed evidence showed that at the time he signed his application, and for many years prior thereto, he had indulged extensively in the use of intoxicating liquors, and had been intoxicated a number of times; and, were there anything in the record to show that, at the time the certificate was issued, neither the company nor its agents or officers had any knowledge of Conter's habits in this regard, the company should not be held to liability in any amount upon the same.

The record here shows that Hume was the assistant deputy head consul of the order, and, while holding that position, came to Denver to organize the local camp at Globeville some time in January or February; that he appointed and employed Dr. Van Landingham to examine Conter for membership; that he discussed with the witnesses Miller and Newman the proposed organization of the local lodge, and the question of presenting members for that lodge, their qualifications, and particularly the qualifications of Conter for membership. It was admitted at the trial that Hume had authority to solicit members, take the documents examined, of whatever nature, and forward the same to the authorities, and, presumably, to employ physicians and direct them to make professional examination of proposed members. The record shows that the benefit certificate was issued by the head consul, and further shows his power to appoint assistant deputy head consuls and fix their compensation. Hume, therefore, being an agent created by the head consul, could not well be considered an agent or representative of the local camp, as the same was not in existence at the time he was engaged in the business of forming it. As he was the direct representative of the chief executive officer of the society at the time of his sojourn in Denver, all knowledge and information obtained by him, respecting the qualifications of proposed members for the new camp, ought to be taken as knowledge and information of the head consul and the order itself. His agency appears to have been of a much higher degree than that of one simply soliciting members for camps already established. It seems that the occasion of his visit to Denver at the time mentioned was for the purpose of creating the new camp, and seeing that it was properly established as required by the rules of the order. Certainly a mere soliciting agent is not generally empowered with authority to establish new camps, hire

physicians, and direct examinations of proposed members, as was done by Hume. Under this showing and under authority of *Supreme Lodge K. of H. v. Davis,* 26 Colo., 252, 58 Pac., 595, I think Hume was an agent of the order, and that knowledge and information concerning the qualifications of Conter for membership, acquired by him in the performance of his duties in that respect, is knowledge and information chargeable to the order, as well as to the head consul. It should also be presumed that Hume promptly notified the chief executive of the order at the home office of the objections urged by the witnesses Miller and Newman to Conter's becoming a member, as well as their reasons therefor. The same remarks may apply in regard to Hume's knowledge of any disorder or serious affection of Conter's heart at the time. It is undisputed that, in addition to the objection made by Miller to Conter's becoming a member of the order on account of excessive liquor drinking, he also objected to such membership by reason of his belief that Conter was afflicted with heart trouble to a degree making him an undesirable member. Miller was a druggist, and, by virtue of his occupation, more or less familiar with human ailments. These facts should have put Hume upon inquiry, and to a further investigation concerning such objections. I think, however, that whatever the answers of Conter might have been concerning the condition of his heart at and prior to the time of his application is of but little moment, as his answer that he had "never had any disease of the heart" was corroborated by the testimony of defendant's physician, Dr. Van Landingham. He testified that he made a careful examination of Conter's heart by modern, approved methods at the time of his examination, and failed to discover any trouble whatever therewith, and certified that he believed he was free from any heart trouble at that time. Certainly the evidence of an experienced physician upon this question

should be conclusive as against a layman's diagnosis of heart ailments. Here Conter's testimony was corroborated by the physician. In addition to this testimony, Dr. Lee, a witness, examined Conter about one month before he died to ascertain his physical qualification for membership in the Prudential Insurance Company, and passed him as a safe risk. All this undisputed testimony on this point ought to eliminate any question as to Conter's heart being sufficiently normal to admit of his membership in the order. The evidence is also undisputed that in January or February, 1909, and prior to the time the insured made his application for membership, the two witnesses, Newman and Miller, discussed with Mr. Hume, assistant deputy head consul of the order, the advisability of accepting insured as a member of the local camp, and both advised against it and gave as reasons that insured drank too heavily and was not a fit person by reason thereof for such membership, Mr. Miller further telling him that he thought insured's heart was in bad condition. It is therefore clear that for about six weeks before the membership certificate was issued Hume knew that insured was a heavy drinker, and that there was at least some question as to the condition of his heart. This knowledge was imparted to Mr. Hume while he was actively engaged in soliciting and considering the qualifications of proposed members for the new local camp at Globeville. From the majority opinion, I extract the following:

"The statement made by Miller to Hume that the assured drank too heavily, and the statement of Newman to Hume that the assured 'was too much of a drinker, to (his) knowledge, for fraternalism,' were vague opinions of the witnesses which did not necessarily conflict with the statements of the assured in his medical examination. * * * They were mere hazy opinions bottomed on no facts disclosed in the record at least."

I notice here that the testimony of Miller and New-man, concerning Conter's liquor drinking habits and heart condition, is designated in the opinion as "vague opinions of the witnesses" and "mere hazy opinions bottomed on no facts disclosed in the record at least." Miller testified as follows:

"I had a discussion with Mr. Hume over the organization of that lodge and the presentation of members for. the lodge. I think I was one of the first men consulted by Mr. Hume as a prospective member. * * * During that conversation I discussed with Mr. Hume the advisability of securing the application of Henry Conter. I had known Conter something over a year. I told Mr. Hume he was not a desirable member for the organization. The reasons that I gave were that he drank too heavily and I thought his heart in bad condition."

Mr. Newman testified:

"I worked with him (Hume) soliciting members for the Modern Woodmen. I had a discussion with him about taking the application of Henry Conter for membership in the Modern Woodmen. * * * The reason I gave for not writing him up was that he was too much of a drinker for fraternalism."

I am at a loss to discover wherein this positive, plain and unambiguous information given by Miller and New-man to Hume should be designated as "vague and hazy opinions of the witnesses." Both were relied upon by Hume for other information in obtaining members. One of the informants was a reputable merchant, and both had known Conter for years, were his neighbors and intimate acquaintances. Who else but the neighbors and associates of Conter could have given reliable information upon the subject? Where could Hume have applied, and to whom, with a hope of securing more reliable information concerning Conter's qualifications for membership? Who but a neighbor or intimate acquaintance

of Conter could have given information concerning the subject more entitled to credence? Who but a neighbor or intimate acquaintance would be more likely to know the habits and general physical condition of Conter? Where is there anything vague or hazy about these statements of Miller and Newman? It is a fair presumption that the very subject matter of the conversation was one of great importance to this company, and can safely be presumed to have been material to the risk. Here was the direct representative of the highest executive officer of the company, strictly in the line of his duty, personally seeking information of divers persons which would qualify or disqualify a prospective member for membership under the rules of the order. No other person but Hume, as shown by the record, was authorized at that time to speak for the general order or head officers thereof, or transact any business for or in their behalf. He was their sole and only representative present, at and about that time, with any power to organize a constituent branch or camp and pass upon the qualifications of the proposed members. He was told plainly and unequivocally that Conter was not a good risk; that he would be objectionable as a member of the proposed camp, for the reason that he indulged to excess in the use of intoxicating liquors; and that it was Miller's belief that his heart was not in good condition.

The court further says: "In our opinion, under the condition of the record, no rule of ordinary diligence required the appellant to pursue its investigation beyond the medical examination." I take issue with the court in this statement. It would seem hard to imagine a situation making it more imperative for an agent or one interested to seek further information upon a subject than the one here disclosed. This conversation took place at Globeville, a small suburban settlement of Denver, and if Hume doubted the veracity or good faith of either Miller

or Newman he could easily have interrogated other mer-
chants and members of that community and satisfied him-
self to the fullest extent of Conter's qualifications to be-
come a member of the camp. These statements of facts
by Miller and Newman were not mere idle passing com-
ments upon Conter's habits and physical condition, but
important facts elicited by Hume in deciding who would
be acceptable members for the local camp. It was the
subject, and the only subject, under consideration at the
time. The conversations were between Hume on the one
part and an existing member of the order and a prospec-
tive member of the camp to be organized on the other.
Prospective members and their qualifications were the
controlling subjects of the conversations, and it was
strictly business of the order in which Hume was en-
gaged. From any standpoint from which the situation
may be considered, it is a reasonable view that it was the
duty of this assistant deputy head consul, if governed by
motives of integrity and real interest in the good of the
order, to have, immediately upon receiving this informa-
tion, positively rejected Conter as a prospective member
of the camp, and to have seen to it that his application
was not considered or received for the purpose of becom-
ing such member; or, if he had declined to take such ac-
tion, under a belief that the information he received was
not entirely reliable or was subject to doubt, the only
honorable thing left for him to do was to investigate fur-
ther and continue his investigation until he was satisfied
of the real character of Conter concerning his liquor-
drinking habits and physical condition; indeed, I think
he should have gone further and written at once to the
head office at St. Louis and informed them that Conter
was not qualified to become a member of any camp of
that order. He occupied a position of great trust and
importance in the order, as compared with an ordinary
soliciting agent who might be in the employ of the order

today and gone tomorrow. The order should not be permitted to escape liability under the circumstances shown, by reason of the warranties and conditions contained in the application and certificate. As a matter of law the order should be held to have waived any warranty or condition contained in those documents, under the facts here shown.

As to the warranty to the effect that this information, acquired by Hume during these conversations with Miller and Newman, should have been reduced to writing and placed in the hands of the head officers before the certificate was issued, I believe this knowledge was in law the knowledge of the head officers, who were thereby presumed to know what Hume knew. The fact that such knowledge was not in writing should be held immaterial. Had Hume performed his duty, as I view it, he would have written at once to the head officers, as above suggested, informing them of Conter's disqualifications.

In the case of *Supreme Lodge K. of H. v. Davis, supra,* our supreme court had under consideration a defense interposed to an action upon a beneficiary certificate upon the ground that the insured, at the time he made his application for membership, falsely stated his age. The uncontroverted evidence there showed that in May, 1890, after the membership certificate had been issued, the beneficiary notified the reporter of the local lodge that the age of insured was greater than represented by him when he became a member, but after such notification the assessments thereafter becoming due for May and June were received and retained by the lodge. The supreme court held that under the circumstances the order could not escape liability by reason of the false representation as to age, and that such defense was waived by accepting and retaining the two assessments mentioned, after it became aware of such falsity. Jus-

tice Gabbert, speaking for the court, used this language, viz.:

"A material, wilful misstatement of an applicant for membership in the order regarding his age would doubtless vitiate the contract of insurance if not known by the lodge or its officers to whom applications for membership are addressed.    *    *    *

"It will also be presumed that he (the agent) has communicated all information to the order which he obtains in the discharge of his duties in making collections on its behalf which affects its rights; or, if he has not, still the order having intrusted him with the particular business, the member paying his assessments to him has the right to deem his acts and knowledge those of the order.    *    *    *    Appellant could not continue to collect assessments after knowledge of misstatements regarding the age of deceased which would affect its rights, and then, when the contract is executed, escape liability upon the ground that he was guilty of a fraud in procuring his insurance; and the financial reporter of the subordinate lodge of which deceased was a member, having received his assessments after notice of alleged misrepresentations regarding his age, and being an agent of the order for the purpose of making those collections, the knowledge which he then had regarding the age of deceased, or his misstatements on that subject, was the knowledge of the order (*McGurk v. Met. L. I. Co.,* 56 Conn., 528, 16 Atl., 263, 1 L. R. A., 563; Bacon's Benefit Societies, sec. 160; *Coolidge v. Life Ins. Co.,* 1 Mo. App., 109), and its acceptance and retention of these assessments, with that knowledge, is a waiver of its right to now raise any question on that subject; and, therefore, whether the evidence sought to be introduced by appellant, regarding the age of Davis, was competent or incompetent, it is not necessary to determine, for, according to the admitted facts, it was precluded from asserting

that defense in this action.—Niblack's Benefit Societies, pp. 565, 566; *Schwarzbach v. Ohio Valley Protective Union,* 25 W. Va., 622, 52 Am. Rep., 227; *Watson v. Centennial Mut. Aid Assn.,* 21 Fed., 698; *Ball v. Granite State Association,* 64 N. H., 291, 9 Atl., 103; *The Masonic Benefit Assn. v. Beck,* 77 Ind., 203, 40 Am. Rep., 295.''

In that case the benefit certificate contained a statement to the effect that the statements made in the insured's application for membership, and those made by him to the medical examiner, were to become part of the contract. It will be noticed that the knowledge of the false statement made by the insured, concerning his age, did not come to the society until after the policy had been issued and delivered. In the case at bar the falsity of the statements of the insured, concerning his intemperate habits, was known to both the assistant deputy head consul and Miller (who afterwards became clerk of the local camp) before the benefit certificate was issued. Such knowledge was possessed by them before Conter filed his application for membership.

It may be well at this time to notice that the witness Miller was one of the charter members of the local camp, and elected clerk thereof when it was organized. He had full knowledge of the extent to which Conter used intoxicating liquors, as well as the possibility that his heart might be affected. This knowledge should be considered knowledge of the local camp, which knew that Conter was one of its members. The record does not show any correspondence between the local camp and the home office concerning Conter's disqualifications, or any objection to Conter remaining a member of the camp.

Many reputable courts, including those next hereinafter cited, hold in cases of this kind that the local lodge or camp bears the relation of agent to the parent organization, with reference to the business transacted at the place where the local camp is situated.—*Order of Colum-*

*bus v. Fuqua* (Tex. Civ. App.), 60 S. W., 1020; *M. W. A. v. Breckenridge,* 75 Kan., 373, 89 Pac., 661, 10 L. R. A. (N. S.), 136, 12 Ann. Cas., 636; *Knights of Pythias of the World v. Bridges,* 15 Tex. Civ. App., 196, 39 S. W., 333.

The appellant, in so far as the insurance features of the organization are concerned, is in effect a mutual life insurance company, and the general rules governing associations of that character control it in the transaction of this branch of its business.—*Chartrand v. Brace,* 16 Colo., 19, 26 Pac., 152, 12 L. R. A., 209, 25 Am. St. Rep., 235; *Supreme Lodge K. of H. v. Davis, supra; Titus v. G. F. Ins. Co.,* 81 N. Y., 410.

On the question of waiver, defendant received the initiation fees, dues, etc., from Conter, and accepted him into full membership of the order after complete knowledge of his false answers touching his liquor habits. This should be sufficient to estop the company from insisting on forfeiture. In law, the head officer (head consul) possessed this information before the certificate was issued, by reason of the fact that his appointee and representative, Hume, was fully informed of the same. In *Prudential Ins. Co. v. Hummer,* 36 Colo., 208, 84 Pac., 61, the supreme court re-submitted the case on the question as to whether certain warranties made by the insured, in his application, concerning his health, were or were not true, and, if untrue, whether or not the company, *by estoppel or waiver,* was precluded from relying upon such false statements as a defense to the action. See *Shotliff v. M. W. A.,* 100 Mo. App., 138, 73 S. W., 326; *Order of Columbus v. Fuqua, supra; M. W. A. v. Breckenridge, supra; M. W. A. v. Colman,* 68 Neb., 660, 94 N. W., 814, 96 N. W., 154; *Biermann v. G. M. L. I. Co.,* 142 Iowa, 341, 120 N. W., 963. In the last cited case the facts are similar to those in the case at bar. The court says:

"It is true the defendant made a strong showing to the effect that the deceased was greatly addicted to the

use of intoxicants, or, as put by some of the witnesses, was a drunkard at the time the policy was applied for; but it is equally apparent that appellant had notice and knowledge of the truth in this respect when it accepted the application and entered into the contract. The appellant had a local office in Marshalltown where the deceased lived, and was evidently a well-known character. An agent in charge and several sub-agents or soliciting agents worked in and about the city and vicinity. The soliciting agent who took the application of the deceased knew of his drinking habits. When the insurance was being negotiated, it was a subject of conversation between the several agents of the appellant in the city as to the doubtful insurable condition of the deceased because of his habits. The application itself discloses his habits, to some degree at least, for, while saying that the applicant did not use malt or spirituous liquors 'to excess,' it further informs the company that he did take 'a glass of beer occasionally.' This was a sufficient disclosure to suggest to a discreet person the advisability of further inquiry if the subject was one deemed of vital importance. * * * Under such circumstances, the fact that the warranty was broken when made constitutes no defense.''

In *Collver v. M. W. A.*, 154 Ia., 615, 135 N. W., 67, the action was against the same company which is appellant here, and the by-laws and warranties pertaining to the contract are practically the same in both cases, except that the warranty requiring information to be in writing and submitted to the head officers is not mentioned in the Collver case. The court there held the company to have waived the conditions of the certificate by receiving assessments from the member after knowledge of his intemperance subsequent to the issuing of the certificate. See also *Thomas v. M. B. A.*, 25 S. D., 632, 127 N. W., 572; *Miller v. M. B. L. I. Co.*, 31 Ia., 216, 7 Am. Rep., 122. In the latter case the court held that the

knowledge acquired by a soliciting agent in the line of his duty is knowledge of the company he represents, the court saying:

"To this latter view the judicial mind seems rapidly tending, and it is certainly more in accord with the enlightened and progressive spirit of the age. These companies select their own agents, require them to enter into bonds for the faithful discharge of their duties, and send them forth provided with blanks and clothed with all the insignia of authority. If their ignorance or their cupidity leads them to recommend improper risks, it is more in consonance with reason that the loss should be borne by the company than that the assured should be made the victim of the incompetency or the avarice of the agents. More especially is this true in view of the fact that the company has the means of indemnity through the bond of the agent. Just principles of public policy require that these companies should be held to a strict degree of responsibility for the acts of their agents. They will thus be led to the exercise of greater circumspection in the selection of agents.    *    *    *

"It is quite true that the technical constructions which have pertained with reference to contracts of this kind, blocking the pathway to justice, and leading to decisions opposed to the general sense of mankind, should be abandoned, and that these corporations, grown opulent from the scanty savings of the indigent, should be held to the same measure of responsibility as is exacted of individuals."

*Kausal v. M. F. M. F. I. A.,* 31 Minn., 17, 16 N. W., 430, 47 Am. Rep., 776; *Garfinkel v. Alliance Life Ins. Co.,* 140 Ill. App., 380; *Pringle v. M. W. A.,* 76 Neb., 384, 107 N. W., 756, 113 N. W., 231.

Innumerable cases in addition to those already mentioned could be cited which are in harmony with them,

but no good purpose can be accomplished by further extending the list.

The evidence appears to be undisputed that Conter's death was caused by fatty degeneration of the heart, but I find nowhere in the record any testimony showing that the intemperate use of liquor directly or indirectly caused his death. The testimony of the physicians goes no further than to show that the intemperate use of liquor is one of the primary causes of fatty degeneration of the heart. But nowhere do they intimate that Conter's death resulted from intemperate drinking. Dr. Bennett, a witness, testified that he assisted in performing the autopsy on the body of Conter, and stated:

"The only cause of death of Henry Conter that I could determine, assisting Dr. Carlin, was fatty degeneration of the heart. There may be many causes of fatty degeneration of the heart. A person that has lived a careful life, through no fault of their own, may be subject to it and die from it, and persons leading careless lives will be more subject to it. * * *

"Many causes may contribute to it. The torpidity of the liver, poor circulation, a bad digestion, and all these things which tend to upset the heart."

The claim by appellant that Conter's death was caused indirectly by intemperate drinking is entirely wanting in proof to sustain it.

Appellant contended that the certificate was forfeited by Conter's false answer to the question, "Do you use intoxicating liquors daily?" to which he answered, "No." This issue was fairly left to the jury, and is presumed to have been decided in favor of plaintiff.

Another point urged by appellant is that the certificate was forfeited by the alleged false answer given to the question, "Have you within the last seven years been treated by or consulted any person, physician or physicians, in regard to personal ailment?" to which question

Conter answered, "No." This was another issue presented by defendant as a defense, upon whom the burden was placed to establish the same by a preponderance of the evidence. In my judgment, considering the testimony in the light most favorable to defendant, sufficient proof was wholly wanting to establish that defense. Miller testified on this point as follows:

"He (Conter) bought some strychnine tablets from me on one or two occasions.   *   *   *   To my knowledge he at no time said anything to me about affliction of the heart, nor that his heart was acting badly. We (Conter and witness) were in the store one day and he (Conter) complained of dizziness.   *   *   *   I suggested to him his stomach was out of order and it might be a good idea for him to take a few strychnine tablets. Prior to that time I noticed Mr. Conter's complexion, and I thought he did not have a very strong heart, but did not care to say anything to him.   *   *   *   Later on he came in and bought strychnine tablets.

"Q. You gave him those strychnine tablets believing yourself from the observation you had made of his condition that it was caused by trouble of the heart?

"A. Not necessarily. I did not know whether that was why he bought them or not.

"Q. I am asking you why you gave him the strychnine tablets.

"A. I gave them to him because he wanted them.

"Q. No, but you said he became dizzy and you thought his heart was in trouble.

"A. I did not tell him that. I said I thought so."

This certainly does not show that Miller was treating Conter for heart trouble or had any settled conviction that he had heart trouble. The evidence entirely fails to show that any physician or other person treated Conter for any heart trouble whatever.

I have no criticism of the rule as stated in the ma-

jority opinion to the effect that insurance companies generally, and their policy and certificate holders, are at liberty to enter into any contract they desire, not prohibited by law, and that it is the duty of courts to enforce such contracts as they find them. At the same time I know of no law or rule that prohibits a party to a civil contract from waiving warranties or conditions inserted therein for his own benefit. When such waiver is satisfactorily shown, the party so waiving is estopped from pleading or insisting upon forfeiture of the contract. I think in this case the company *did* waive the warranties and conditions contained in the application and certificate; that the knowledge of Hume, concerning Conter's disqualification for membership in the order, by reason of his liquor habits, was, under the facts disclosed by the record, knowledge of the head officers of the company; and that receiving from Conter all fees and dues chargeable to him as a member, and issuing to him a full certificate of membership, after such information, ought to, and should, be taken as a waiver on the part of the company of such warranties and conditions.

In the consideration of this case, and in searching authorities, I am forcibly impressed with the fact that the printed reports of the several states are honeycombed with cases wherein this appellant appears as a party, and seemingly has felt itself called upon with deplorable frequency to protect its treasury from the "attacks" of widows and orphans of deceased members, which members in their simplicity have indulged the belief that in case of death the silent certificates held by them spelled comfort, sustenance, education and support, to those most cherished and loved by them.

It appears to me that the majority opinion in effect suggests to every association of this character that it is neither its legal nor moral duty to exercise any caution or discrimination in selecting agents to secure members

or transact its business, and that it need not concern itself as to the probity or veracity of such agents. The direct result of the opinion places the entire responsibility of an agent's dishonesty or derelictions upon the insured, or, more unfortunately, upon the innocent beneficiaries. By inserting in policies a warranty, such as here found, requiring written notice to head officers, etc., all consideration by the company of an agent's honesty or veracity becomes useless and unnecessary.

I think the judgment should be affirmed. I am authorized to say that Judge Morgan concurs in this dissent.

Decided July 14, A. D. 1913. Rehearing denied December 8, A. D. 1913.